van Gestel, J.
This matter is before the Court after a bifurcated evidentiaiy hearing on the issue of whether the directors, or at least a majority of the directors, of Demoulas Supermarkets, Inc. were “interested” when acting on the matters in issue. See Memorandum and Order on Rule 16 Conference, dated October 14, 2003. The matters in issue and the procedural and legal posture warrant explication before the Court sets forth its findings and rulings on the matters considered.
PROCEDURAL AND LEGAL BACKGROUND
This is a Mass.R.Civ.P. Rule 23.1 derivative action, basically between Arthur S. Demoulas (“Arthur S.”) and his cousin Arthur T. Demoulas (“Arthur T.”), with allegations spilling over against the directors of Demoulas Super Markets, Inc. (“DSM’j. The amended complaint characterizes the case as a “demand excused” case.[2]
In general, before filing a derivative action on behalf of a corporation, a plaintiff “must establish that... all available means to obtain relief through the corporation itself’ are exhausted by making a demand on the corporation’s board of directors to prosecute the litigation... The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation’s business policy, including decisions whether to pursue a lawsuit . . . However, if a majority of directors are alleged to have participated in the wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a “demand excused” case.
Harhen v. Brown, 431 Mass. 838, 844 (2000).
The demand requirement is found in Mass.R.Civ.P. Rule 23.1 wherein it is said, “The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority, and the reasons for his failure to obtain the action or for not making the effort.”
This case was filed in 2003, prior to the enactment of the new Massachusetts Business Corporation Act, G.L.c. 156D. See Chapter 127 of the Acts of2003. This new law did not become effective until July 1, 2004.[3] It is prior to the date of filing a derivative claim that any demand must be made. Consequently, the law *131 that will be applied to the present evidentiary proceeding — at least insofar as it relates to pre-suit demand requirements — will be that in place prior to the new Act.
A demand on the directors may be excused as futile if the directors are “otherwise interested.” Harhen, supra, 431 Mass, at 844.
In Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 523 (1997), the SJC affirmed a finding by the trial judge that the then directors of DSM were “interested” in that they “had a business or financial relationship with Telemachus [Demoulas]’s family, were subject to his controlling influence, or stood to benefit personally from the transactions at issue.”
This Court has already determined that in the present situation
a majority of the current directors are not shown by the amended complaint to have any business or financial relationship with Arthur T. or his side of the Demoulas family, nor have they been shown to stand to benefit personally from the transaction at issue. Thus, unless they are shown to be subject to Arthur T.’s controlling influence, under the standards for determining interestedness set out in Demoulas, supra, 424 Mass.] at 523-24 and Harhen[, supra, 431 Mass.] at 842-43 and n.5, they must be considered and treated ... as disinterested.
Memorandum and Order on Motions to Dismiss, September 22, 2003 [16 Mass. L. Rptr. 701].
The triggering event for this lawsuit is a September 9, 2002, memorandum request from Arthur T. addressed to the DSM directors, asking them to facilitate his “desire to have the freedom to pursue [his] own interests within the same type of business as DSM or any other type of business. To have such freedom of action, [he] would need to end any fiduciary duty [he has] to DSM in any capacity.” Arthur T. advised the DSM board, “In order to accomplish this, I propose to resign my position with the company if [the board will] permit me to transfer my shares of the company’s Class B common stock to my wife Maureen, who will then transfer them to an irrevocable voting trust.” By so doing, Arthur T. said, his wife “will receive the economic benefits associated with the shares, but the trustee will have sole voting power.”
Arthur S., by his complaint, seeks a declaration pursuant to Mass. G.L.c. 231 A, Sec. 1, that “Arthur T. has fiduciary obligations to DSM and to Arthur S., that he may not extinguish by nominally transferring the economic benefits associated with his DSM stock to his wife, and voting rights relating to that stock to a ‘trustee’ selected by Arthur T. and who will be paid, and subject to removal at regular intervals, by his wife.”
Arthur S. also seeks related declaratory and injunctive relief, as well as “all damages caused by [the defendant directors’] waiver of the existing restrictions upon the transfer of Arthur T.’s shares, and their failure and refusal to impose meaningful restrictions on Arthur T.’s rights to compete with, solicit the employees of, usurp the corporate opportunities of, or misappropriate the confidential information of, DSM, in breach of their fiduciary duties to DSM.”
DSM is a close corporation under Massachusetts law. It “was initially formed as a Delaware corporation in 1964; in 1982, a new Massachusetts corporation was formed and the Delaware corporation was merged into it.” Demoulas, supra, 424 Mass, at 511.
DSM’s Articles of Organization prevent the transfer of any shares in the company to anyone unless those shares are first offered for sale to DSM. If offered, the market value of the shares is to be determined by an expert appraisal. Upon completion of the appraisal, the DSM board may then choose to purchase, or not to purchase, those shares. If the board elects not to purchase the shares, they then may be sold to any third party or entity. The Articles further provide that the directors may waive DSM’s right to insist upon the foregoing procedure. Arthur T.’s memorandum to the directors of September 9, 2002, sought such a waiver.
The directors held a number of meetings at which they considered Arthur T.’s request.[4] At the first meeting, on September 18,2002, the proposal was defeated by a vote of four to two, with one director abstaining. At the second meeting, on November 13, 2002, after a presentation by Arthur T., the directors voted five to two to approve the waiver. The five voting in favor included the directors who are named as defendants in this action. This latter vote was conditioned upon Arthur T.’s willingness to enter into an agreement that, according to Arthur S., would leave Arthur T. “free to compete [with DSM] in the Real Estate Business and would impose restrictions of little practical significance on his- ability to compete with DSM in the Supermarket Business, to solicit DSM employees, or to utilize DSM’s corporate opportunities.”
The situation regarding the demand and the question of interestedness or bias on the part of certain DSM directors breaks into two different parts. First, there is the action by the defendant directors in ultimately voting in favor of Arthur T.’s request for a Waiver, coupled with the demand that the corporation sue, among others, those directors for whatever damages, if any, may accrue therefrom. Second, there is the issue of whether the corporation should proceed with Arthur S.’s demand for a declaratory judgment relating to whether Arthur T., after his proposed transfer of his stock to his wife, and then to a voting trust, still retains any fiduciary duties to DSM. While not ripe for determination at this time, each of those situations appears burdened with substantive weaknesses, and the second, relating to the declaratory judgment, has a potential procedural limitation; both it appears should be kept in mind when assessing the various directors’ status.
*132 On the issue of voting to grant the waiver, this Court has some difficulty in understanding what it is that constitutes legally redressable “wrongdoing" on the part of Arthur T. in requesting, and the various defendant directors in considering and acting upon, a waiver that is expressly provided for and included in the DSM Articles of Organization. Was it wrong for the directors to act upon Arthur T.’s request? If they refused to act, could Arthur T. have brought his own derivative suit against them for not acting? Indeed, could Arthur S. himself have brought a somewhat differently focused derivative suit against the directors if they failed to act and deny Arthur T.’s request? In short, it really appears to be the business judgments exercised by the directors in voting contrary to Arthur S.’s wishes that he is complaining about. Should a disagreement with the exercise of business judgment be found to state a claim upon which relief may be granted and excuse Arthur S. from the demand requirement?
What may — or may not, depending upon things that have not yet occurred — become a wrongdoing on Arthur T.’s part depends upon the extent to which, despite his transfer of stock that he holds in a closely held Massachusetts corporation, he may still retain fiduciary duties to DSM. Those issues, however, seem quite premature, at least until a Court has before it the facts about what he has done. So far as this Court knows, Arthur T. has not even made the transfer of his stock at this time. Thus, how can the interestedness or bias of the directors affecting their actions with regard to a declaratory judgment suit be measured if what is before the Court is nothing more than a hypothetical proposition on which the determinative facts have not yet occurred?
These concerns cannot be ignored and should be included in the blend of the stew that relates to whether a demand can be excused.
There are two cases that provide some — but far from total — guidance on how to proceed and what to look for, Harhen, supra, 431 Mass. 838, mentioned above, and Houle v. Low, 407 Mass. 810 (1990). Both cases dealt with the status of special litigation committees and are incomplete in their teachings because of the situational and procedural postures in which they were decided.
Harhen came up after allowance of a motion to dismiss. It involved, basically, whether a special litigation committee, appointed by admittedly disinterested directors, was sufficiently alleged in the complaint to be interested. If the allegations of interestedness were adequate, then the committee’s determination not to proceed with the litigation would not be governed by the business judgment rule; and if the allegations were insufficient, then the business judgment rule would apply. The SJC determined that the allegations in the complaint did not meet the Rule 23.1 pleading-with-particularity standard and affirmed the dismissal.
Houle came up after the allowance of a motion for summary judgment in which the trial court determined that there were no material factual matters in dispute on the issue of the disinterestedness of a one-person special litigation committee appointed by clearly interested directors in a closely-held corporation. The SJC in Houle detemined that there were disputed factual matters on the issue and remanded for a hearing.
Neither Harhen nor Houle presents the same legal or procedural issues as are presented here. Thus, while there is language in those cases that provides some indication as to what the law may be, they are far from conclusive on the points in issue here. .
The Court embraces two things from Harhen and Houle.
From Harhen it follows the teaching that the SJC has adopted 1 ALI Principles of Corporate Governance: Analysis and Recommendations Secs. 1.15 and 1.23 (1994) for purposes of determining whether a director is “interested” in a matter presented in a derivative action. Harhen, supra, 431 Mass, at 842-43 and n.5; Demoulas, supra, 424 Mass, at 523-24. Only one of the four ALI principles is applicable in this case. It is found in sec. 1.23(a)(4) which reads:
(a) A director ... is “interested” in a transaction or conduct if
(4) The director ... is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director’s . . . judgment with respect to the transaction or conduct in a manner adverse to the corporation.
From Houle this Court adopts the SJC’s direction that there needs to be “an evidentiary hearing before [the Court] without a jury to determine whether . . . [the directors] were independent and unbiased.” Houle, supra, 407 Mass, at 824.
What, then, is the “transaction” on which Arthur T.’s controlling influence “could reasonably be expected to affect . . . director[s’] judgment ... in a manner adverse to the corporation”? This Court, as noted above, sees two issues: (1) the action ultimately favoring Arthur T.’s request for a waiver; and (2) whether, after the waiver is granted and the stock is transferred, Arthur T. still retains any fiduciary duties.
The Judgment Following Rescript entered in the underlying case in Demoulas v. Demoulas Supermarkets, Inc., Middlesex Superior Court #90-2344-B, dated February 4, 1999, in Section 20 thereof, reads as follows:
The shareholders [of DSM shall] elect a new board of directors that shall henceforth consist of:
*133 i. Two members of the George Demoulas family or their nominees, including Arthur S. Demoulas;
ii. Two members of the Telemachus Demoulas family or their nominees!,] excluding Telemachus Demoulas, D. Harold Sullivan and James T. Curtis; and
iii. Three disinterested, independent directors who meet the standards of independence as published by the New York Stock Exchange (“NYSE”).
It is in the context of the previous procedural and substantive issues that this Court conducted an evidentiary hearing on the DSM directors’ interestedness and bias, and now makes the following findings of fact and rulings of law.
FINDINGS OF FACT
All of DSM’s stock is owned, in various ways, by different members of the Demoulas family. The heirs of George Demoulas constitute the “Class A” shareholder group. Arthur S., a son of George Demoulas, is a Class A shareholder. The wife and children of the late Telemachus A. Demoulas are members of the “Class B” shareholder group. Arthur T., a son of Telemachus Demoulas, is a Class B shareholder.
Rafaele Demoulas (“Rafaele”) is the widow and administratrix of the estate of Evan Demoulas, another son of George Demoulas and a Class A shareholder. In an arrangement alluded to but not explained to the Court, Rafaele recently has been permitted by the Class B shareholders to propose one of the B directors of DSM, and Rafaele votes the estate’s shares with the Class B shareholder group when electing A-B directors.
The Court in the earlier Demoulas litigation mentioned above awarded control of 2,500 shares of DSM to what is now Arthur S.’s branch of the family and who are entitled to select and vote for A directors and 2,450 shares to what is now Arthur T.’s branch of the family and who are entitled to select and vote for B directors. However, because of a dispute between Arthur S. and his sister-in-law Rafaele, and with litigation thereon pending in the Middlesex Probate and Family Court, 75 of the A shares are not voted.
There is nothing that compels any A or B shareholder to vote his or her shares in any particular way or block, except that only A shareholders can vote for A directors and only B shareholders can vote for B directors. Despite the absence of any requirements therefor, however, the two branches of the Demoulas family tend to vote in blocks, except occasionally for Rafaele. Without the 75 shares that are subject to the Arthur S./Rafaele dispute, voting control in connection with the A-B directors is in Arthur T.’s side of the family if they all vote the same way.
Currently, and at all times material to this proceeding, the Class A directors are and have been Gerard J. Levins (“Levins”) and Arthur S. The Class B directors are and have been Sumner Darman (“Darman”) and Edward H. Pendergast (“Pendergast”). Pendergast, however, was selected by Rafaele, although he was elected exclusively by the Class B shareholders. The A-B directors are and have been J. Terrence Carleton (“Carleton”), Charles Roazen (“Roazen”) and William J. Shea (“Shea”). Shea serves and always has served as chairman.
The Court observes that Arthur S. is not charging Levins, who appears to be an attorney in the significant employ of Arthur S. and Arthur S.’s regular supporter in DSM corporate matters, with being interested or biased in connection with the issues for which demand is claimed to be excused. Levins has not been named as a defendant by Arthur S. in this litigation. No evidence was presented by anyone charging Levins with disqualifying interest or bias. Perhaps this clarifies Arthur S.’s position that it is not whether a director acts upon and votes on Arthur T.’s request that is wrongdoing; it is instead hew that director votes, which, of course, seems to be a matter of business judgment. In any event, this Court finds that, for these purposes, Levins is not shown to be an interested or biased director.
Arthur S., while certainly interested in the outcome, is not interested and biased against himself and the interests of the other A shareholders, except perhaps Rafaele, in any way such as to legally be disqualified from acting on his own demand or to enable him to claim that any demand on the directors was excused.
For all purposes of this case, the same seven directors have been in office. Thus, if any two of the remaining five A-B or B directors are disinterested and unbiased, there will be, along with Levins and Arthur S., a disinterested and unbiased majority on the board and a demand by Arthur S. ought not be excused.
Next the Court will find the facts regarding the three A-B directors, Carleton, Roazen and Shea. None of these three directors, indeed none of the five remaining directors, has any financial relationship to Arthur T. or his side of the family.
J. Terrence Carleton is a 49-year-old graduate of Bentley College and holds an MBA from Suffolk University. His employment history includes two years at Bache, Halsey, Stuart and Shields as a securities analyst; eight years as a senior analyst and institutional investor at Kidder, Peabody, the final two years being after General Electric Credit Corporation acquired Kidder, Peabody; and his last fifteen years have been in charge of the Technology Communications practice and as a senior corporate executive at the Boston advertising firm of Hill, Holliday, Connors, Cosmopoulos. Carleton serves on the boards of other companies as well.
Carleton was selected for board membership by Arthur T. He was first elected to the board on June 17, 2002.
Carleton met Arthur T. many years ago when they both were undergraduate students at Bentley College. *134 The two men were not close friends in college, nor were they enemies. Thereafter, Carleton and Arthur T. would cross paths infrequently at Bentley College alumni gatherings, but they were not otherwise social acquaintances. Carleton had a somewhat similar Bentley College-related relationship with Evan Demoulas, Rafaele’s late husband.
Carleton is a Trustee of Bentley College, and in that capacity he became aware that Arthur T. was considering a relatively large gift to the college. Although Carleton was involved in Bentley’s fund-raising campaign, he was not a participant in any discussions with Arthur T. regarding the gift. The gift, which was actually from the Telemachus and Irene Demoulas Family Foundation, was in the amount of $1 million, and the check, dated July 1, 2003, was signed by Arthur T. In that same year the Telemachus and Irene Demoulas Family Foundation made a similar $1 million gift to Boston College.
Carleton never discussed Arthur T.’s waiver request or any other DSM corporate matters with Arthur T. outside of the DSM board meetings.
On the first occasion that the waiver request was brought before the board in September 2002, Carleton abstained from voting because he was new to the board and wanted further information on which to make a judgment.
Charles Roazen received his MBA in 1954 from the Harvard Graduate School of Business Administration. Thereafter, he became employed by Standard Auto Gear Co., Inc., a family-owned company started by his grandfather in 1910. From 1956 to 1988, Roazen served as the President of Parts Distributors, Inc., another closely-held family business in the automotive aftermarket. Parts Distributors, Inc. operated several distribution centers and 30 auto parts stores in eastern New England.
Roazen also became a co-owner and director of Carquest, Inc., the second-largest national marketer in the automotive aftermarket. Between 1982 and 1983 Roazen served as chairman of AIS, Inc., which was involved in selling insurance to trade associations. In 1982, Roazen cofounded Counterworks, Inc., which provided turnkey computer systems for point-of-sale applications in inventory-intensive retail businesses. In 1988 Roazen founded, and still serves as chair of, First Management Services, Inc., a closely-held family enterprise providing financial and real estate management services.
Roazen, through his wife’s position as a beneficiary of a substantial family trust, has available to him resources worth approximately $10 million.
Prior to joining the DSM board, Roazen had never met any members of the Demoulas family. He was asked to join the board by Sumner Darman, a longtime friend and lawyer who did legal work for the Roazen family.
Roazen has no social relationship with Arthur T, and he never discussed Arthur T.’s waiver request with him outside of a directors meeting.
Roazen was first elected to the board in June 1999.
William J. Shea is 56 years old and serves as chair of the DSM board. Shea received a Master’s Degree from Northeastern Universiiy in 1972. After receiving his degree, Shea began his employment with the national accounting firm, Coopers & Lybrand. At Coopers & Lybrand, Shea rose to partner and subsequently became the firm’s Vice Chairman.
In 1993 Shea joined BankBoston Corporation, where he became Vice Chairman and Chief Financial Officer. At BankBoston, Shea had oversight for financial operations, treasuiy operations, capital markets, international operations, and national consumer financing activities. In 2001 Shea became the Chief Operating Officer of Conseco, Inc., a large insurance and financial services company in Indiana. A year later Shea was elected President and Chief Executive Officer of Conseco, and in 2003 he was elected to its board of directors.
Shea did not know any member of the Demoulas family before coming on the DSM board. He was, however, acquainted with Robert Famham, Arthur T.’s brother-in-law, through meetings at youth hockey games played by Shea’s and Farnham’s sons.
Shea has no social relationship with Arthur T, and he never discussed Arthur T.’s waiver request with him outside of a directors meeting.
Shea, like Roazen, was first elected to the DSM board in June 1999.
There is nothing in Carleton’s, Roazen’s or Shea’s introduction to the DSM board of directors that in any way demonstrates that any of them, when they arrived, were subject to Arthur T.’s controlling influence. Further, their personal business histories compel the inference that they would not likely submit to such control.
The same certainly can be said of Edward H. Pendergast, one of the two B directors. For approximately 38 years Pendergast has worked as a Certified Public Accountant in the Boston area. He has served on the boards of numerous companies and is actively involved in the accounting profession. For many years Pendergast has served as director of the Boston Chapter of the National Association of Corporate Directors, an entity of which he also has been Vice President. Pendergast also has moderated an orientation program for newly elected directors sponsored by the Boston Chapter of the NACD, which program includes emphasis on director “disinterestedness.”
Since 1989 Pendergast has operated his own firm, Pendergast & Company, providing corporate financial services to entrepreneurially driven businesses. He assists clients in developing and implementing financial strategies, in securing equity or debt financing, in *135 taking businesses public, in developing strategic alliances, in valuing businesses and in assisting in key negotiations.
As noted above, Pendergast was suggested for a DSM board seat by Rafaele Demoulas, an A director. He was elected as a B director in June of 2001.
The remaining B director, Sumner Darman, is in a somewhat different position from that of the rest — except, perhaps, for Gerard Levins. He, too, is a lawyer, and he has performed a significant amount of legal work for DSM and Arthur T. at times when DSM was under the control of Arthur T.’s father, Telemachus Demoulas. Darman also has represented Arthur T.’s interests in real estate and trust and estate matters from time to time. While this does not necessarily cloak Darman with a mantel of interestedness or bias, it gets him closer than all the rest — again, except, perhaps, for Levins.
Given the foregoing, the Court must next make findings on those issues raised by Arthur S. about the defendant directors, aside from their initial invitation or nomination to the DSM board, that could be seen as making any of Carleton, Roazen, Shea or Pendergast interested or biased in the matters at hand.
The Court begins not with findings, but rather with allegations by Arthur S. in his complaint. Each of these allegations will then be explicated by particular findings. The allegations may be summarized as follows:
1. The Class B shareholders, in alliance with Class A shareholder Rafaele Demoulas, have selected the A-B directors. (Complaint Paras. 15 & 16.)
2. The A-B directors were “selected by, or requested to act as directors by Telemachus Demoulas, Arthur T. or a person acting on their behalf.” “Their continuing status and substantial compensation as directors of DSM is wholly dependent on the continuing support of Arthur T. and his branch of the Demoulas family.” (Complaint Para. 16.)
3. The five defendant directors “have consistently advanced the interests of Arthur T.’s branch of the Demoulas family at the expense of DSM and its other shareholders.” (Complaint Para. 17.)
Examples of these actions are: allowing DSM to pay Telemachus Demoulas a $1,000,000-per-year consulting fee and to make “substantial annual contributions” to his DSM Profit Sharing Plan, and providing him a company car; allowing Arthur T. to remain as a high-paid executive of DSM; allowing Telemachus Demoulas and Arthur T. to serve as trustees of the DSM Profit Sharing Plan; allowing Darman to serve as counsel to DSM while also serving as personal counsel to Arthur T., to serve as intermediary between DSM’s independent counsel and Arthur T. over the matter in issue, and giving improper advice regarding the consequences of Arthur T.’s proposal; allowing the same accounting firm that serves Arthur T. and his side of the family to also serve as accountants for DSM; and ignoring alleged evidence that Arthur T. had invested in a spring water company that was a corporate opportunity for DSM. (Complaint Para. 17, sub-paras, a through f.)
4. The defendant directors voted in favor of Arthur T.’s proposal to waive the limitations on his transfer of stock despite Arthur T.’s stated intention to compete with and harm DSM. (Complaint Paras. 20, 23, 24 & 33.)
5. The defendant directors voted to approve an agreement with Arthur T. that was grossly favorable to Arthur T. in his ability to compete with DSM, acquire its corporate opportunities and solicit away its employees. (Complaint Para. 27.)
6. The defendant directors failed to seek appropriate independent legal advice before voting on Arthur T.’s proposal and contract. (Complaint Para. 29.)
7. The defendant directors attempted to justify their actions on Arthur T.’s proposal by proffering “entirely pretextual” comments. (Complaint Para. 32.)
With regard to the first allegation, as noted above, there is insufficient evidence of an “alliance” between Class A shareholder Rafaele and the Class B shareholders for this Court to make findings thereof. Nevertheless, with respect to each of the A-B directors involved here, Rafaele did vote for their election in the same way as all of the B shareholders.
On the second allegation, the Court finds that of the three A-B directors and the two B directors, only Carleton, Shea and Darman were suggested for their positions by some person who is a member of Arthur T.’s side of the family. Even Shea’s connection, however, was only with Farnham, a brother-in-law of Arthur T. Roazen and Pendergast were not selected by any member of Arthur T.’s side of the family.
Further, as alleged, given the current status of the stock available to vote, the B shareholders hold a majorify of voting stock and, if they all voted in a block, could remove all of the A-B directors, or any one of them, on short notice. Such a vote, if made, would, of course, remove any director from his status as such and deprive him of his compensation as a director. The extent to which Arthur T. has sufficient control over the votes of the remaining B shareholders, however, was not the subject of any evidentiaiy presentation to this Court. Certainly, as witnessed by the Arthur S./Rafaele dispute, Arthur S. does not have control over all of the A shareholders. None of the other B shareholders, nor Rafaele, the A shareholder said to be in alliance with the B shareholders, testified or submitted any affidavit evidence.
The third allegation asserts that the A-B and B directors “have consistently advanced the interests of Arthur T.’s branch of the Demoulas family at the expense of DSM and its other shareholders.” As a generalized statement, this Court was not presented *136 with sufficient evidence to make such a finding. No evidence was presented on all votes on all issues to enable a finding that the votes consistently favored Arthur T.’s branch of the family, as opposed to the best interests of DSM as a corporation. Arthur S. does, however, provide evidence on certain particular actions which are said by him to be examples of favoritism to the Arthur T. side. The Court will, therefore, address each example proffered.
The first of these issues relates to the compensation afforded to Telemachus Demoulas during the time of the defendant directors’ terms in office and prior to his death. The evidence supports the following findings: Telemachus was in the employ of DSM for more than 60 years, although at the end, and particularly after the decision in Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501 (1997), his day-to-day involvement with the company was greatly diminished; his compensation of $1 million per year, however, was set by management, not the directors; when questions were raised at directors meetings by Arthur S. about Telemachus’s compensation, the board designated a committee consisting of Levins and a now former director named Behrakis to review the matter; after presenting the results of that review to the directors on October 23, 2001, Levins moved that Telemachus Demoulas’s compensation be eliminated, and directors Darman, Shea, Roazen and Pendergast voted against it; next Behrakis presented a motion to reduce Telemachus Demoulas’s salary to $300,000 per year; the Behrakis motion did not receive a second, including by either Arthur S. or Levins; no further action was taken on the subject at the October 23,2001, meeting; later, at a meeting on May 15, 2002, Levins again moved to eliminate Telemachus Demoulas’s salary, but to pay him a reasonable consulting fee for the time he actually consulted with any member of the management team, which vote failed two to five, with Darman, Shea, Roazen and Pendergast, along with Behrakis, voting in the negative;[5] the subject did not come up again prior to Telemachus Demoulas’s death in 2003.
Arthur S. next charges the defendant directors with failure to question Arthur T.’s salary. The evidence supports the following findings on this issue: Arthur T. has worked for DSM for about 27 years; his compensation is not set by the directors, but rather by management; members of management reported to the directors that Arthur T. has been “a great asset to the company”; Arthur T.’s compensation is significant, but less than each of the four vice presidents of DSM; in or around October 2001, Arthur T.’s salary was increased by management from $520,000 per year to $750,000 per year; on several occasions, various directors and members of management made statements to the effect that Arthur T. was not really an important employee at DSM and that the company would not suffer if he left; no board vote on Arthur T.’s compensation was presented at the evidentiaiy hearing.
While the amount of compensation for Telemachus Demoulas and Arthur T. might seem large to many, when viewed within the backdrop of what DSM produces generally, and has produced recently for shareholders like Arthur S. specifically, a vastly different portrait emerges.
The gross annual income of DSM was said by Arthur S. to be “a little less than” $2 billion dollars a year. The approximate annual net income, he suggested, is around $180 million.
In November 2002, DSM distributed $545 million to its shareholders. The directors’ vote for that distribution came at the same September 18,2002, meeting that Arthur T. first presented his request for a waiver. Arthur S.’s share of that distribution was “in the ballpark of 54 and a half million dollars.”
Arthur S. charges the defendant directors with failure to properly supervise the activities of Arthur T. with regard to the DSM profit sharing plan. The evidence supports the following findings on this issue: Arthur T. and D. Harold Sullivan have been trustees of the profit sharing plan since 1986; the directors appoint the trustees; the plan is for the DSM employees and, at the time of the hearing, had approximately $250 million in assets; no person suggested by Arthur S. or his family has ever been a trustee of the plan; there was a histoiy of litigation and Department of Labor issues regarding the plan, all of which was resolved long before any of the present directors were elected; at a March 27, 2001, directors meeting, the trustees of the plan were directed to report to the board at the next meeting with respect to the management, assets and related matters involving the plan; the directors engaged the law firm of McDermott, Will & Emery to advise them on their duties regarding the plan; on advice of McDermott, Will & Emery to director chair Shea, the trustees of the plan were excused from coming to the next meeting because of, Shea said, the law firm’s concern that their appearance might subject the board to duties with respect to the plan; no McDermott, Will & Emery witness testified at the evidentiary hearing; again, at the October 23, 2001, directors meeting, the directors defeated a vote to request the plan trustees to appear and decided instead to hire a consultant to review the trustees’ performance; Mercer Consulting, however, was not engaged as that consultant until after the filing of this law suit; there is no evidence of poor performance by the plan, in which company profits of approximately 15% of DSM’s payroll are invested yearly, yielding a fund currently well in excess of $200 million; the trustees retain professional investment advisers to manage the plan assets, which include both State Street Bank and Goldman, Sachs; the plan is audited yearly by an independent accounting firm.
*137 Arthur S. complains that the defendant directors have improperly continued to retain Sullivan & Bille, the accounting firm that also acts for members of Arthur T.’s family. The evidence supports the following findings on this issue: Sullivan & Bille has performed accounting work for DSM for many years; D. Harold Sullivan of that firm was a close personal friend of Telemachus Demoulas for 40 years; Sullivan was criticized for his activities in support of Telemachus Demoulas against the interests of DSM in the prior lawsuit; Deloitte & Touche currently reviews Sullivan & Bille’s work for DSM, pursuant to a court order, and has not identified any material problems with that audit work; there was an effort to switch the accounting work to KPMG, but a motion to do so was defeated by Darman, Roazen, Carleton and Shea.
During the course of consideration of Arthur T.’s request, and on advice of the then President of the Massachusetts Bar Association, the directors engaged attorney James Wallace of Bowditch & Dewey to advise them and to negotiate terms with Arthur T. regarding his situation after the transfer of his stock. The Court does not find the engagement of Mr. Wallace to be, as charged by Arthur S., a failure to seek appropriate legal advice on Arthur T.’s proposal and contract.
The coordinator or intermediary from the directors to Mr. Wallace was Darman, who also acted as counsel for DSM. Arthur S. charges that Darman, because he also served as counsel to Arthur T., had conflicts of interest that made his role as intermediary with Mr. Wallace inappropriate.
It seems appropriate to recite Mr. Wallace’s final conclusions to the directors after his review of the situation. Mr. Wallace provided to the directors a letter dated June 13, 2003, containing his opinions on certain issues. The letter is attached to the complaint as Exhibit E. In the letter he opined that, in the absence of a noncompetition agreement, an at-will employee like Arthur T. may leave his employment and, subject to certain restrictions, engage in competition with his former employer, but he could not misappropriate trade secrets or use confidential information for his own interests. Mr. Wallace also observed, however, that Arthur T. is a minority shareholder as well as an employee and therefore has fiduciary duties — explained in the letter — running to DSM arising from that status. Mr. Wallace’s letter concludes with the following two paragraphs addressing the proposed agreement with Arthur T.:
Absent controlling case law, it cannot be said with certainly that Arthur T.’s transfer of the DSM shares to Maureen and Maureen’s subsequent transfer of the shares to the voting trust release Arthur T. of his fiduciary duties to DSM and the other shareholders. Therefore, with respect to the issue of corporate opportunities, we cannot advise DSM and its Board of Directors that entering into the proposed agreement with Arthur T. provides DSM with greater protections than DSM is entitled to under common law. On the other hand, the non-competition and non-solicitation provisions of the proposed agreement clearly afford DSM greater protection than it would have vis-a-vis Arthur T. as a former employee.
Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company.
After the discussions at the August 4, 2003, directors meeting, by a vote of five to two, the proposed transfer of Arthur T.’s shares and the agreement negotiated by Mr. Wallace were approved. It was the five defendant directors who voted in favor.
Whatever may be the legal or ethical issues relating to Darman serving as the intermediary with Mr. Wallace — a subject upon which this Court makes no ruling here — it seems quite clear, and this Court finds, that Mr. Wallace was not inhibited in any way in his work, and his advice to the directors was clearly spelled out. Whether he would have opined differently had he known more about Darman’s representation of Arthur T. or had he known that Arthur T. also had a controlling interest in more than just the stock standing in his name, at this time, at least, remains unknown because Mr. Wallace was not a witness, nor did he submit any affidavit, at the evidentiaiy hearing. This Court, therefore, finds that the directors were not misled or ill advised by Mr. Wallace as a result of Darman’s professional relationship with Arthur T.
Arthur S. also alleged that the defendant directors ignored evidence that Arthur T. had invested in a spring water company that was said by Arthur S. to be a corporate opportunity for DSM. The Court makes no findings on this issue. It recalls no evidence on the point. Arthur S. makes no request for findings on this issue, perhaps for the same reason.
Arthur S. charges that the defendant directors voted to approve the agreement with Arthur T. and grant his requested waiver despite Arthur T.’s stated intention to compete with DSM. This Court does not find differently. Arthur T.’s reasoning for seeking the waiver are clearly spelled out in his initial memorandum of September 9,2002, quoted above, in pertinent part, on p. 3.
The last claim in the complaint is that the defendant directors’ stated reasons justifying their vote on Arthur T.’s proposal were “entirely pretextual.” This Court makes no finding or ruling on this charge because whatever the directors’ stated reasons were does not constitute evidence that they were under the “controlling influence” of Arthur T.
RULINGS OF LAW
The Court begins these rulings of law with some general comments regarding matters of corporate gov *138 emance and the role of the Court in connection therewith.
The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiffs demand can exercise their business judgment in the best interests of the corporation, free from significant contrary personal interests and apart from the domination and control of those who are alleged to have participated in wrongdoing. See Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993). If the plaintiff has failed to allege facts that meet this standard with regard to particular board members for purposes of a ruling on a motion to dismiss, that member is deemed “disinterested.”
Harhen, supra 431 Mass, at 843-44.
As stated earlier,
The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation’s policy, including the decision whether to pursue a lawsuit. See Bartlett v. New York, NH and H.R.R., [221 Mass. 530, 532 (1915)]; Dunphy v. Traveller Newspaper Ass’n, 146 Mass. 495, 497 (1888) (“It would be contrary to the fundamental principles of corporate organization, to hold that a single shareholder can at any time launch the corporation into litigation... to prevent methods of management which [he or she] thinks unwise”).
Id. at 844.
The fact that the procedural requirement of a demand is excused in a given case . . . does not extinguish the substantive principle that the decision as to what is in the corporation’s best interest is a matter of business judgment. An independent and unbiased committee can weigh and balance the divers factors in a given case and make a business judgment as to the proper course of action.
Houle, supra 407 Mass, at 821.
“[C]ourts must be careful not to usurp the committee’s valuable role in exercising business judgment.” Id. at 822.
The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision. Even in those cases where a committee is independent and conducts a thorough investigation, the judge may conclude that the committee’s decision is contrary to the great weight of the evidence. In conducting its review, the court should look to factors such as those identified by ALI, which include the likelihood of a judgment in the plaintiffs favor, the expected recovery as compared to the out-of-pocket costs, whether the corporation itself took corrective action, whether the balance of corporate interests warrants dismissal, and whether dismissal would allow any defendant who has control of the corporation to retain a significant improper benefit. See ALI Principles of Corporate Governance, sec. 7.08 (Tent. Draft No. 8, 1988).
Id. at 824-25.
Houle, in footnote 10, counsels that the “evidence” referred to “will often constitute policy factors which bear on the propriety, in a business sense, of pursuing the derivative suit. The judge should weigh such considerations along with all others to determine whether they fairly support the committee’s ultimate decision.” And in footnote 11, the Houle court states, without explaining how, that “[t]he factors which contribute to making a corporation a close corporation may... bear on the independence and good faith of a committee in such a corporation,” and “a reviewing court should consider those factors in its inquiry.”
As said above, Harhen and Houle each were focused on special litigation committees appointed by boards of directors, which appointing-directors were in one instance disinterested and in the other interested. This Court, in this case, sees no valid reason to treat the directors themselves any differently, and it will not.
This Court detects in Harhen and Houle, two very recent decisions, a distinct and strong message that the SJC wants trial judges to recognize that it is directors that determine issues and exercise business judgments for corporations, not judges whose total knowledge of what makes good business sense is enormously limited. Arthur S. brushes aside Dunphy v. Traveller Newspaper Ass’n, 146 Mass. 495, 497 (1888), as a 19th-century relic. He seems to overlook the fact that Dunphy was cited with approval in Harhen, a 21st-century decision.
Corporations, it must be remembered, are not institutions established to ponder and make judgments on matters of morality and purity; they exist primarily to make money for the shareholders. The “raised eyebrow” is said to be the compass to find liability by someone inured to the rough and tumble of the world of commerce; rascality, not an absence of purity, is what is seen as wrongdoing in the business world. See, e.g., Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1981). Nor should this case metamorphose into a form of Dickensian Christmas Carol, replete with ghosts from Christmases past providing grounds for litigation over every perceived slight.
The mere fact that directors were selected, nominated and elected by a particular shareholder has long been rejected as insufficient to establish a director’s lack of independence or disinterestedness. Dunphy, supra 146 Mass, at 498. See also Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984); White v. Panic, 793 A.2d 356, 366 (Del.Ch. 2000).
Arthur T. may be grasping for a vehicle that freed him from fiduciary obligations to DSM, a company that has made him a very wealthy man. Arthur S., in an identical economic position from the same DSM, may *139 well want to build a high barricade to thwart his cousin’s desire. But their personal animosity — well demonstrated in the annals of Massachusetts law — is not what should be the controlling feature here. Rather, what is important is the best interests of DSM and how that is achieved by those asked to direct it. The test of whether the directors have failed, or have favored Arthur T. over Arthur S., is not dressed in absolute perfection, but rather in whether they acted in good faith, unfettered by the controlling influence of Arthur T.
Arthur S. and the Court disagree over who, as between him and the defendant directors, has the burden of proof in the present situation. One can read Houle and Harhen over and over again and still be left with doubt. Consequently, this Court, having now seen and heard the antagonists on the witness stand, under oath, and reviewed the documentary evidence, will proceed to decide the issue without being controlled by any burden of proof position.
What was presented by the evidentiary hearing and the briefing that followed revealed a tacit admission by Arthur S. that no single act or factor is sufficient to establish that Arthur T. maintained a controlling influence over the unbiased business judgment of any of the directors, particularly Carleton, Roazen, Shea and Pendergast. Thus, Arthur S. asks this Court to aggregate events and find bias from an array of separate incidents and past decisions claimed to favor Arthur T. and his side of the family as “powerful evidence of a controlling interest.” See Plaintiffs Post-Hearing Reply Memorandum, p. 5. These other facts, however, must “raise a significant prospect that the directors would be adjudged liable to the corporation or its shareholders.” ALI Principles, sec. 1.23(c).
On the very next page of Arthur S.’s Post-Hearing Memorandum, he lays out the essence of his position:
A single decision favorable to a control group might have been on the merits. However, it is highly unlikely that an unbroken succession of decisions that protect or advance the interests of a control group is the product of unfettered business judgment — particularly in the absence of any decision that was opposed by the control group or that favored other stockholders over the control group. That is a pattern that exists in this case.
Even as an abstract statement, this Court finds the foregoing hard to credit under the circumstances presented here. But when examined more closely, it fails completely.
First, the use of the phrase “highly unlikely” suggests something that means that the Court must presume the defendant directors were under the controlling interest of Arthur T. This Court declines to rest this case on such a presumption.
Next, Arthur S.’s case is grounded on two propositions upon which any evidence was lacking: (1) “an unbroken succession of decisions that protect or advance the interests of a control group”; and (2) the existence of a “control group.”
As stated above, the Court was not presented with “an unbroken succession of decisions”; nor were the events that were presented shown to protect or advance the interests of any control group, as opposed to addressing issues in the interest of DSM. It is the latter that is the duty of directors, not the favoring of one shareholder over another. Here, some of the decisions challenged were the product of events that occurred before any of the defendant directors held their positions. See for example, the setting of Telemachus Demoulas’s compensation, the employment of the trustees for the DSM Profit Sharing Plan and the engagement of Sullivan & Bille as accountants. The fact that the new directors only discussed, but did not take determinative action on these points, hardly can be said to be “an unbroken succession of decisions” favoring anyone. Further, on several of the matters occurring before June 2002, Carleton was not even a board member. On others, who but DSM is favored? See the matters relating to the trustees and their action with regard to the DSM Profit Sharing Plan or the retention of Sullivan & Bille as accountants.
Perhaps the factor that shatters this whole theory is the issue of what is meant by the phrase “control group.” Of course the Court understands Arthur S. to mean those people who own a majoriiy of the votable stock in DSM. But the phrase “control group” has a special meaning in corporate law. It refers to a group with authority to direct the corporation’s actions. See, e.g., Upjohn Co. v. United States, 449 U.S. 383 (1981). Persons in a control group of certain corporations are subject to special obligations under the securities laws. See, e.g., In re Fidelity/Micron Securities Litigation, 964 F.Sup. 204 (D.Mass. 1997).
Arthur S. has alluded to, but presented no explanatory information regarding, some form of “arrangement” between his sister-in-law, Rafaele, an A shareholder and the B shareholders. Absent such an arrangement — indeed, even with it — the A shareholders control 2,500 shares of DSM, and the B shareholders control only 2,450 shares. This should put the A shareholders in control. What prevents the A shareholders from exercising their controlling vote — assuming, of course, they could agree among themselves to vote as a block — is the dispute between Arthur S. and Rafaele. This does not make the B shareholders a control group, other than potentially, unless there is something that has not been shown that binds them to vote as a group, and even then only as long as Arthur S. and Rafaele continue to squabble. In short, it would seem that voting control, which is what Arthur S. appears to be equating with the phrase “control group,” is within the A shareholders’ ability to achieve if they would only resolve their own internal dispute. They, thus, seem like Shakespeare’s “enginer . . . hoist *140 with his own petar.”[6] This does not make a control group of the various B shareholders in a way that makes the directors, or some of them, appear to have produced a succession of decisions favorable to that group.
Recently, the Delaware Chancery Court stated the issue now before this Court as follows: “At bottom, the question of independence turns on whether a director is, for any reason, incapable of making a decision with the best interests of the corporation in mind.” In re Oracle Corp. Derivative Litigation, 824 A.2d 917, 938 (Del.Ch. 2003). “The primary basis upon which a director’s independence must be measured is whether the director’s decision is based on the corporate merits of the subject before the Board, rather than extraneous considerations or influences.” Beam v. Stewart, 845 A.2d 1040, 1049 (Del. 2004). Having these principles in mind, this Court concludes and rules that, to the extent it may be their burden to prove, the DSM directors Carleton, Roazen, Shea and Pendergast, at least, have established that they were not “interested” or “biased,” nor were they under the controlling influence of Arthur T. in acting upon his request for a waiver for the transfer of his stock in DSM to his wife Maureen, and then for her subsequent transfer of such stock to an irrevocable voting trust.
Further, and to the extent relevant to this issue, this Court rules that the decision by the DSM directors to grant the waiver was not lacking in rational business judgment. The process, from September 2002 through August 2003, as revealed in the verbatim transcripts of the directors meetings, demonstrates to the reader the careful and extensive attention given by the DSM directors to the matter in issue and the lack of bias in the process. Such a reading also reflects the difficulty faced by this particular board in attempting to run a company in the midst of the family shareholders’ immense animosity. Every director’s act or word is suspected of having an ulterior motive at its base.
The denial — given the opportunity — to proceed to a trial seeking damages, which seem ephemeral at this time, or a declaratory judgment, which seems premature at this time, would not be an aberrant exercise of business judgment by those directors.
This board was faced with several options that it could not — and did not — avoid considering. On Arthur T.’s request for a waiver it could: (1) refuse to act and run the risk that it would be sued by Arthur T., or that he would consider any refusal to act to be a de facto denial to set in motion the appraisal and purchase option, thereby freeing him to transfer his stock as he saw fit; (2) act on the request, and deny it, thereby setting up the same scenario as in the first option; (3) act, conduct the appraisal and buy his stock, thereby freeing him from any fiduciary obligations and providing him with a large sum of money with which to compete; (4) act and allow the request, with an attempt to obtain some protection from future competition and the acquisition of corporate opportunities, and get sued by Arthur S., as it was. Indeed, there may be other options as well. But key to all this is Mr. Wallace’s closing words in his letter of June 13, 2003: “Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company.”
The courts of Massachusetts have contributed substantial time and effort to sort out the issues relating to ownership and control of DSM by and among the members of the Demoulas family. Judge Lopez, in splitting the stock ownership with 2,500 for Arthus S.’s side and 2,450 for Arthur T.’s side, directed a massive shift in control. It is not the Massachusetts courts’ fault that a rift between two of the A shareholders now has, for the present at least, nullified Judge Lopez’s efforts.
Similarly, Judge Lopez rendered a significant ruling when she established a basis whereby a board of directors for DSM could be split equally with two each between the A and B shareholders, and with an additional three disinterested directors to be elected by all shareholders choosing to vote. Again, it is not the Massachusetts courts’ fault that the affected parties’ own inability to agree has resulted in a shift in that balance.
Nor, however, are those shifts in any way proof of disqualifying interest or lack of good faith by those directors who struggle to act in DSM’s best interest in the midst of a familial rugby scrum that greatly impedes their efforts.
In so ruling, this Court makes no determination whatsoever regarding the effect of such a stock transfer as sought by Arthur T., in the manner proposed, on any continuing fiduciary duties he may continue to have to DSM, a closely-held Massachusetts corporation.

The defendant directors insist that there was a demand, and that it was denied. That issue, so far, has only been raised on a motion to dismiss. It remains open for another day.

The Court makes this observation because, at least for certain purposes, it may now be dealing with a creature that is about to become extinct. Under G.L.c. 156D, the new Massachusetts Corporation Act, in Sec. 7.42, a demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand.

Apparently, since the resolution of Demoulas, supra 424 Mass. 501, all meetings of the DSM board of directors have been stenographically transcribed. Thus, this Court has been provided with and has reviewed the transcripts of each directors’ meeting at which Arthur T.’s request for a waiver was discussed and acted upon.

Carleton did not become a director until June 2002, and, therefore, he did not participate in this, or several of the other matters complained of

The Tragicall Historie of Hamlet Prince of Denmarke, Act III, Scene iv, lines 206-07.