Fabricant, Judith, J.
INTRODUCTION
The is the latest battle in the long-running war among members of the Demoulas family regarding control of the company they jointly own, Demoulas Super Markets, Inc. (DSM). As a result of a recent realignment of one relatively small group of family members (the “Rafaela group”), the owners of class A shares (those aligned with Arthur S. Demoulas) have taken control of the board of directors. The owners of class B shares (those aligned with Arthur T. Demoulas, the company’s current president), dissatisfied with certain decisions made by the newly constituted board, have brought this action seeking declaratory and injunctive relief. Now before the Court is the plaintiffs motion for a preliminary injunction to prevent implementation of certain decisions, particularly the board’s recent decision to distribute $300 million to shareholders, pending trial on the merits. After hearing and review of all materials submitted, for the reasons that will be explained the motion will be denied.
BACKGROUND
The background of the conflict is set forth at considerable length in a series of decisions of this Court and of the Massachusetts appellate courts, among which are Merriam v. Demoulas Super Markets, Inc., 464 Mass. 721 (2013); Demoulas v. Demoulas, 432 Mass. 43 (2000); Demoulas v. Demoulas, 428 Mass. 555 (1998); Demoulas v. Demoulas, 428 Mass. 543 (1998); Demoulas v. Demoulas Super Mkts., 424 Mass. 501 (1997); Demoulas v. Demoulas Super Mkts., 66 Mass.App.Ct. 118, 850 N.E.2d 1135, 2006 WL 2057476 (Mass.App.Ct. 2006); Demoulas v. Demoulas Super Mkts, Inc., 18 Mass. L. Rptr. 130, 2004 WL 1895052 (Mass.Super. 2004); Demoulas v. Demoulas Super Mkts., Inc., Middlesex Superior Court Civil Action No. 90-2927B, 1995 WL 476772 (Mass.Super. Aug. 2, 1995).
In Middlesex Superior Court Civil Action No. 90-2344, after a lengthy trial a juiy found extensive wrongdoing by members of the branch of the family that is now associated with Arthur T. against members of the branch that is now associated with Arthur S. Among the remedies ordered by the Court (Lopez, J.) in a judgment issued on September 2, 1997, was a reallocation of shares among the family members, such that the Arthur S. faction would hold a slight majority. The shares assigned to the Arthur S. faction are referred to as class A shares, and those of the Arthur T. faction as class B shares. The Court also ordered a reconfiguration of the board, so that it would consist of seven members: two members of each side of the family or their nominees (referred to respectively as the A and B directors), and three “disinterested, independent directors who meet the standards for independence as published by the New York Stock Exchange (’NYSE’).” The Supreme Judicial Court affirmed the judgment in most respects, but remanded for further proceedings as to certain issues not pertinent here. Demoulas v. Demoulas Super Mkts., 428 Mass. 591-92 (1998). On June 15, 1999, the company adopted amended by-laws incorporating the board structure ordered by the Court. Final judgment after rescript entered on August 8, 2000, including the same order regarding reconfiguration of the board.
Between 1999 and June of 2013, the group of A shareholders that has been referred to as the Rafaela group voted with the B shareholders. The result was that the B shareholders controlled the selection of the *510 A/B directors even though that group held a slight minority of shares. Throughout that period, and to this date, Arthur T. has served as president of the company. In June of this year, the Rafaela group realigned with the A shareholders. The result was that the power to control the selection of the A/B directors shifted to the A shareholders, who hold a slight majority of shares.
In August of 2012, the A shareholders designated defendant Keith O. Cowan as one of their two directors. Cowan, according to all the evidence submitted, has had a long and distinguished career in business and law, including a history of earnings such that he would have no economic need for the fees his service as a director of DSM would bring. He had no prior relationship or acquaintance of any kind with DSM or anyone involved with it. Soon after he began his service, Cowan developed concerns about the company, which he expressed in a letter to the then board chair, dated October 18, 2012. Cowan’s letter indicated his intention to propose to the board resolutions that would impose certain limits on management’s authority to act without board approval; establish an approval process for related-party transactions; require specified planning and analysis before real estate investments; and replace the trustees of the company’s profit sharing plan. Cowan also expressed concerns about management’s views regarding capital structure, and proposed that the board discuss that topic at its next meeting. Cowan did not at that time propose replacing Arthur T. as president, or otherwise changing management personnel.
The shareholders elected a new board at an annual meeting on June 18, 2013. The A shareholders designated Arthur S. to the A director position Cowan had held. By majority vote the shareholders elected Cowan and two others to the three A/B seats. The B shareholders designated two of those who were displaced from A/B director positions to B director positions. Thus, Cowan shifted from an A director position to an A/B director position, and two others shifted from A/B director positions to B director positions.
Conflict erupted promptly thereafter, initially manifested in the refusal of the two B directors to attend the first scheduled meeting ofthe newboard, depriving the board of a quorum.[1] The A shareholders and directors filed suit in this Court, Civil Action No. 2013-2318, seeking an order compelling the B directors to attend; a preliminary injunction issued by stipulation.[2] The board then met, with a quorum, on July 18, 2013. At that time the board elected Cowan as interim chair and appointed him to both the finance committee and a special committee formed to review the performance of the president. At a meeting on August 22, 2013, the board voted to make a distribution to shareholders of $300 million.[3] Four board members, the two A directors and two of the A/B directors, including Cowan, voted in favor; one A/B director abstained, and the two B directors voted against.[4]
The plaintiffs filed this action on September 5, 2013, seeking declaratory and injunctive relief. The crux of their claim is that Cowan is not qualified to serve as an A/B director because he is not disinterested.[5] On that basis, they contend, eveiything the board has done since his election to that position, or at least those decisions that depended on his vote, is void. The complaint seeks a declaration to that effect, along with an injunction barring the Board from “taking or enforcing any votes on any matter or taking any steps to execute, or require any others to execute, any such vote unless said vote was approved by all six board members other than Mr. Cowan.”[6]
DISCUSSION
Under the well-established test of Packaging Industries Group v. Cheney, 380 Mass. 609, 617 (1980), a preliminary injunction is warranted only when the moving party establishes both a likelihood of success on the merits of the claim, and a substantial risk of irreparable harm in the absence of an injunction. Once these factors are established, the Court must balance them against the harm that an injunction will inflict on the opposing party. Id; see Tri-Nel Mgmt, Inc. v. Bd of Health of Barnstable, 433 Mass. 217, 219 (2001).[7]
The crux of the plaintiffs’ claim is that Cowen is not “disinterested” for purposes of the requirement, appearing in both the judgment entered by Judge Lopez and the company’s by-laws as adopted based on that judgment, that the A/B directors be “disinterested, independent directors who meet the standards for independence as published by the New York Stock Exchange (’NYSEj.” Plaintiffs construe that provision to impose two separate and distinct requirements for A/B directors: they must “meet the standards for independence as published by the New York Stock Exchange (’NYSEj”; and they must also be “disinterested” as that term is defined in the ALI Principles of Corporate Governance, §1.23(a) (1994). See Harhen v. Brown, 431 Mass 838, 842 (2000) (adopting ALI standard for purposes of shareholder derivative action to determine whether directors who decided to refuse a demand to commence litigation were disinterested, such that their refusal to do so was subject to protection of business judgment rule). Section 1.23(a) of the ALI Principles states that “[a] director or officer is ‘interested’ in a transaction or conduct” if any of four circumstances exist. Plaintiffs invoke only the fourth, which reads as follows:
(4) The director or officer is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director’s or officer’s judgment with respect to the transaction or conduct in a manner adverse to the coloration.
Plaintiffs contend that Cowan is subject to the controlling influence of Arthur S., who has a material pecuniary interest in all of the board’s decisions.
*511 Defendants advance a different interpretation of the requirement for A/B directors ordered by Judge Lopez. In their view, the word “disinterested” does not establish a requirement separate from the word “independent,” but merely modifies that word. The phrase “disinterested, independent,” they contend, should be read as a whole, so that it establishes a single requirement: that the directors meet the standards of independence established by the New York Stock Exchange. The Court agrees with defendants, for each of two separate reasons.
First, Judge Lopez’s order incorporates the New York Stock Exchange standards, but makes no reference to any separate standard by which to measure disinterestedness. Clearly Judge Lopez recognized the necessity of explicitly designating an objective, widely recognized standard, and knew how to identify such a standard. It is implausible that she would have intended to incorporate the ALI standard without making explicit reference to it.[8]
Second, and perhaps more important, the ALI standard by its terms serves to evaluate disinterestedness in relation to a particular “transaction or conduct.” That phrase appears both in the introductoiy clause of §1.23(a) and in each of the four subsections, including the one plaintiffs invoke. Courts have applied the ALI standard in exactly that manner. See e.g. Harden, supra, 431 Mass, at 842-43 (considering whether directors were disinterested with respect to alleged malfeasance that shareholders demanded board bring suit to remedy); Boylan v. Boston Sand & Gravel Co., 22 Mass. L. Rptr. 290 (Mass.Super. March 14, 2007), at *9 (considering whether directors were disinterested for purposes of approval of self-dealing transaction by other directors). Plaintiffs have identified no case applying the ALI standard to an individual’s overall eligibility to serve in a particular capacity, and it is difficult to see how the standard could be applied in that manner consistent with its language. The Court concludes, therefore, that a person who “meet[s] the standards for independence as published by the New York Stock Exchange (’NYSE’)” is “disinterested, independent” within the meaning of Judge Lopez’s order and the company’s by-laws.
Even if the Court were to adopt plaintiffs’ interpretation of the eligibility requirement, it would not conclude on this record that plaintiffs are likely to succeed in proving that Cowan is interested under the test of ALI Principle § 1.23(a)(4). That subsection, as set forth supra, establishes a two-part test, both parts of which must exist for an individual to be interested: he “is subject to a controlling influence” by an interested person, and “that controlling influence could reasonably be expected to affect [his] judgment ... in a manner adverse to the corporation.”
Plaintiffs’ effort to meet the first prong of the test rests largely on the fact that Cowan was an A director before he was an A/B director. But nothing in Judge Lopez’s order, in the by-laws, or in any other identified authority, prohibits an individual from serving in those capacities at different times. Nor is such a prohibition inherent in the structure Judge Lopez established. To the contrary, it is inevitable that when shareholders elect A/B directors by majority vote, the group that holds the majority will nominate and vote for persons who are acceptable to them. That an individual elected in that manner may be a person whom the same group has previously chosen as its own designee is hardly surprising. See Demoulas v. Demoidas Super Mkts, Inc., 18 Mass. L. Rptr. 130, 2004 WL 1895052, at *15; see also Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1984) (“it is not enough to charge that a director was nominated or elected at the behest of those controlling the outcome of a corporate election . . . That is the usual way a person becomes a corporate director”).
Plaintiffs also rely on assertions that Cowan took positions as an A director that echoed positions Arthur S. had taken, and that as an A/B director Cowan has voted “in lock-step” with Arthur S.[9] This argument, in the Court’s view, is similar to a litigant asserting that a judge has demonstrated bias by repeatedly ruling in favor of the other side. Bias might explain such a pattern of rulings, but a more likely explanation is that the judge believes that side’s positions are correct. If Cowan agrees with Arthur S. based on his own independent judgment, then the two will vote the same; the pattern does not indicate that Arthur S. controls him.
Plaintiffs point also to assertions in affidavits of the B directors to the effect that: on one occasion while Cowan was an A director, he said that he would not be “allowed” to vote a certain way; Cowan and Arthur S. used matching notebooks at the July 18, 2013, meeting; the two have “caucused” during breaks in meetings; Arthur S. silently mouthed an instruction to Cowan in connection with the vote at the August 22 meeting; and the like. The Court gives little weight to these subjective interpretations of observations made by witnesses whose bias is plain.
Even if evidence of the sort offered could establish that Arthur S. has some form of control over Cowan, that would not in itself meet the second prong of ALI Principle §1.23(a)(4) that such control “could reasonably be expected to affect [his] judgment ... in a manner adverse to the corporation.” That sort of control would have to be more than mere loyalty or susceptibility to persuasive power; it would have to be such as to divert a director’s attention from his fiduciary duty to act in the interest of the corporation. In the absence of evidence of any financial or similar pressure, and in light of Cowan’s background and the complete absence of any interaction between him and DSM or anyone connected to it until just over a year ago, it is difficult to imagine how Arthur S. could exercise the sort of control over Cowan that would lead him to act adversely to the corporation. Clearly, the A and B shareholders disagree as to the interests of the corporation. But such disagreement is not evidence of a breach of fiduciary duty on either side. The Court *512 concludes, therefore, that plaintiffs have failed to show a likelihood of success on the merits.
That failure obviates any need to consider irreparable harm or the balance of harms. The Court will address these issues briefly nonetheless. Irreparable harm is harm that is imminent, and that cannot be redressed by monetary damages. Tri-Nel Mgmt, supra, 433 Mass, at 227-28. As indicated supra, the board decision of which plaintiffs principally complain is to distribute $300 million to shareholders, on a pro rata basis. Plaintiffs have offered no plausible theory as to how implementation of this decision will cause them harm, still less irreparable harm. At argument, plaintiffs asserted that they now receive a tweniy percent return on their holdings in DSM, which they will be unable to match on individual investments of the funds they will receive. That sort of harm, if it were to occur, could be remedied by monetary payment. But nothing in the evidence before the Court supports plaintiffs’ assertion. To the contrary, the evidence submitted indicates that the company has some $500 million in cash, on which it receives returns at a rate of less than one percent. Surely the plaintiffs will be able to do better than that with the amounts they receive. Plaintiffs suggest that the distribution will harm the corporation in various ways, such as by reducing its flexibilily to invest without borrowing. But such effects, if they occur, will not harm the plaintiffs directly, and plaintiffs do not purport to assert any derivative claim.[10]
On the other side of the scale, issuance of an injunction would impose real and substantial harm on the defendants. Aside from delaying distribution of funds, it would deprive defendants of corporate democracy. The majority shareholders have the right, under Judge Lopez’s order and the company’s by-laws, to elect a majority of the board, as long as they do so in accord with the eligibility requirement discussed supra, and to have the company governed by the board so elected. Court intervention to bar implementation of the board’s decisions would deprive the majority of this right. The Court declines to intervene.
CONCLUSION AND ORDER
For the reasons stated, the Plaintiffs’ Motion for a Preliminary Injunction is DENIED.

The agenda for that meeting, scheduled for June 24, 2013, included a proposal to remove Arthur T. as president. According to affidavits of two DSM executives, Arthur S. told each of them that Arthur T. would be voted out of his position at the next board meeting. One affiant attributes to Arthur S. the statement that “I have the votes to fire Arthur T. and I intend to do so.” Arthur S. denies making such statements. The Court finds it unnecessary to resolve this factual dispute because the statements, even if made, are ambiguous. “I have the votes” could mean, as plaintiffs contend, that Arthur S. controlled sufficient votes or believed he did, but it could also and perhaps more plausibly mean that he believed a majority of the board members agreed with him and would vote accordingly. In any event, as of this date the board has not voted to remove Arthur T. from the position of president.

Cowan submitted an affidavit in that action reciting the sequence of events with respect to notice of and attendance at meetings. Plaintiffs contend that his having done so is inconsistent with his statement at a subsequent meeting that he was “not part of the litigation.” The Court sees no inconsistency; Cowan was not a party to that case.

At the same meeting, the board’s audit committee reported its finding, after review, that each of the A/B directors was independent based on the NYSE standards. The board voted to adopt that finding; no directors voted against, but the two B directors abstained. The board met again on the morning of September 19, 2013,justhours before the hearing on the present motion, and voted on whether to “reaffirm the independence of’ each of the three A/B directors. The parties have submitted conflicting affidavits regarding the outcome of the vote as to Cowan. A transcript of the meeting leaves the Court in doubt as to who voted how, but the Court does not consider it necessary to resolve this factual dispute regarding a vote taken in the midst of litigation.

The abstaining A/B director commented, “I am not opposed to a big dividend. I am just uncomfortable with the speed at which this has come before us.”

At argument on the present motion on September 19, 2013, plaintiffs conceded that Cowan “meet[s] the standards for independence as published by the New York Stock Exchange (’NYSEj.” In a post-argument letter received on September 20, 2013, plaintiffs withdrew that concession, but do not assert any basis for challenging his independence under those standards.

As indicated supra, the preliminary injunction sought in plaintiffs’ motion is slightly narrower than that prayed for in the complaint; the motion asks the Court to order that the distribution be stayed pending trial, along with “any and all action approved by the Board where Mr. Cowan was or is a deciding vote,” and “any unilateral decision or other action by Mr. Cowan as interim chairman of the Board or as Chairman of the Finance Committee, other than purely procedural matters, which was not ratified or approved by a majority of the members of the Board of Directors, excluding Mr. Cowan be stayed.” The motion also seeks an order that “Mr. Cowan be precluded from participating as a member of the Special Committee,” and that “approval of any action by the Board of Directors requires the vote of a majority of the directors excluding Mr. Cowan.”

In circumstances where the issuance or denial of an injunction might affect the public interest, the Court must also consider that effect. See T&D Video, Inc. v. City of Revere, 423 Mass. 577, 580 (1996). No such potential effect appears here, where the dispute arises among private parties with respect to control of a private business.

Although the Supreme Judicial Court decided Harhen after Judge Lopez had entered her initial judgment ordering reconfiguration of the board, the ALI test was familiar to Massachusetts courts well before Harhen, and Judge Lopez had applied it with respect to derivative claims among DSM shareholders. See Demoulas v. Demoulas Super Mlcts., 424 Mass, at 523-4, cited in Harhen, 431 Mass, at 842-43, reviewing Middlesex Civil Action No. 90-2927B, 1995 WL 476772 at *77 (Mass.Super. Aug. 2, 1995).

defendants point out that most of the votes plaintiffs cite were unanimous, and only two instances occurred in which Cowan and Arthur S. voted together in opposition to the B directors.

Were they to do so, of course, they would be required to make demand on the directors, whose decisions would be protected by the business judgment rule. See Houle v. Low, 407 Mass. 810, 822 (1990); Donahue v. RoddElectrotype Co. of New England, Inc., 376 Mass. 578, 589-90 (1975)