Gants, Ralph D., J.
The defendant Manchester Sand, Cement & Gravel Co., Inc. (“Manchester Sand”), a wholly-owned subsidiary of the defendant Boston Sand & Gravel Co. (“Boston Sand”), is in the business of acquiring property to mine sand, gravel, and stone that Boston Sand turns into ready-mix cement. Typically, after mining out the property, Manchester Sand will sell the property. Manchester Sand owns roughly 3,000 acres of property in Hooksett, New Hampshire. Most of this land is located on the east side of Route 3, but roughly 250 acres is located about one-half to one mile to the west of Route 3 (“the West Side Property”). Among Manchester Sand’s mined-out property is a 42-acre parcel of land that is part of the West Side Property (“the 42-Acre Parcel”). On May 21, 1996, Boston Sand’s Board of Directors unanimously authorized Manchester Sand to lease the 42-Acre Parcel to defendant, Ankat Properties Inc. (“Ankat”), a corporation owned by two of Boston Sand’s officers and directors, defendant Dean M. Boylan, Jr. (“Dean, Jr.’j and his sister, defendant Jeanne-Marie Boylan (“Jeanne-Marie”), for $2,000 per month, with a three-year option to buy. The Ground Lease (“the Lease”) for the 42-Acre Parcel, providing a ten-year lease term, was executed on June 30, 1996 by Dean, Jr. as Manchester Sand’s President and Jeanne-Marie as President of Ankat.
At the time of the Lease, Daniel J. Boylan, Jr. (“Dan”), the uncle of Dean, Jr. and Jeanne-Marie, was a shareholder of Boston Sand and, indirectly, of Manchester Sand (since Boston Sand owns and controls Manchester Sand). As a result of the Separation Agreement he entered into with Boston Sand on June 15, 1995, Dan at the time of the Lease was no longer an officer or director of Boston Sand.
This action was filed by the plaintiffs, Dorothy L. Boylan (Dan’s wife) and Paul F. Ryan, as co-executors of Dan’s Estate (“the Estate”). Count I is brought as a shareholder derivative action on behalf of Boston Sand and Manchester Sand, alleging that Dean, Jr. and Jeanne-Marie breached their fiduciary duty by misappropriating a corporate opportunity — the Lease of the 42-Acre Parcel — for less than its fair market value. The Estate seeks rescission of the Lease and the disgorgement of all profits earned from the Lease prior to the rescission. Since the Estate is only a shareholder of Boston Sand, which wholly owns Manchester Sand, this is a “double derivative” action, meaning an action brought by a shareholder of a parent corporation on behalf of a subsidiary. “The wrongs addressed include wrongs directly incurred by the parent corporation as well as those indirectly incurred, because of wrongs suffered by the subsidiary company.” Kessler v. Sinclair, 37 Mass.App.Ct. 573, 577 n.8 (1994), quoting Sternberg v. O’Neil, 550 A.2d at 1107 n. 1, which cites 13 Fletcher, Cyclopedia of the Law of Private Corporations §5977 (rev. perm. ed. Supp.1988).
Count II alleges that Boston Sand breached the Separation Agreement by causing Manchester Sand to enter into the Lease without prior notice to Dan, as required under that Agreement. It also alleges that Boston Sand breached the Separation Agreement by increasing the magnitude of its transactions with Collden Corporation (“Collden”), a corporation owned by Dean, Jr. and Jeanne-Marie which performed trucking services for Boston Sand, beyond the level approved by that Agreement without prior notice to Dan or the approval of the Board.
The matter is now before the Court on the defendants’ motion for summary judgment.
BACKGROUND
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the Estate and should not be misunderstood as findings of the Court.
*292 In 1957, upon the death of Daniel J. Boylan, Sr., his two sons — Dan and Dean Boylan, Sr. (“Dean, Sr.”) — became substantially equal shareholders in Boston Sand and its various subsidiaries. Dean, Sr., however, managed the family businesses; Dan relinquished financial control to his brother. Over the years, Dean, Sr. increased his family’s ownership in the family corporations to 64 percent, while Dan’s ownership interest decreased to 23 percent. Dean, Sr.’s two children, Dean, Jr. and Jeanne-Marie, with their father’s approval, formed Collden, a company owned by them, that took over the trucking of the sand, gravel, and concrete that Boston Sand supplied to various businesses.
In the early 1990s, Dan consulted an attorney, Douglas Moxham, who prepared a draft shareholder derivative complaint alleging various breaches of fiduciary duty by Dean, Sr. and his family, including but not limited to wrongdoing regarding the related family transactions. The draft complaint was sent to Lawrence Silverstein, an attorney with the law firm of Bingham, Dana & Gould who served as corporate counsel to Boston Sand and was a member of the Boston Sand Board of Directors. The disputes set forth in that draft complaint were ultimately resolved without litigation through negotiations that led to the execution of a Settlement Agreement dated October 7, 1994. In addition, Dan’s active employment at Boston Sand ended in 1988 when Dan underwent life threatening surgery due to an ulcer. Dan’s resignation from his positions at Boston Sand were among the matters resolved through the June 15, 1995 Separation Agreement. Silverstein was actively involved on behalf of Boston Sand in the negotiations leading to both the Settlement and Separation Agreements.
Under the Separation Agreement, Dan resigned from all of his positions as an employee, officer, and director of Boston Sand. Since he still retained a substantial minority equity interest in Boston Sand, the Agreement provided various limitations on related party transactions. Certain specified existing transactions were expressly permitted to continue, provided the terms of those transactions did not materially change. Separation Agreement atcJI6(a). If Boston Sand were to consider entering into any other related party transaction with Dean, Sr. or his children, Boston Sand was required, no later than 30 days before Boston Sand obtained Board of Director approval of the transaction, to provide Dan with written notice of the proposed transaction, along with certain information regarding the proposed transaction, including the information provided to the Board.[1] Id. at 16(b). Once Dan received such notice of a proposed related party transaction, he had 30 days to provide Boston Sand with his written objections to the transaction, or be deemed to have waived any such objection. Id.
Collden’s provision of trucking services to Boston Sand was among the transactions that were specifically authorized by the Separation Agreement, in the absence of “material change.” Id. at T[6(a) & Schedule 6-1. If there were a “material change,” this related party transaction would be treated as a new related party transaction, which must be approved by the Boston Sand Board, with the notice described above given to Dan. Id. The Separation Agreement provided:
[I]t is agreed and understood that any change or changes totaling in the aggregate 10% or more of any Baseline Level (as defined below) shall be considered such a material change . . . For these purposes, the “Baseline Levels” are the price levels and the levels of volume or other quantity associated with the applicable Continuing Transaction . . . provided, that all such price Baseline Levels shall be adjusted to reflect changes in the CPI from the date applicable to that Baseline Level.
Id. at 16(c) (emphasis in original).
The Lease of the 42-Acre Parcel
In 1988, Manchester Sand retained Leggatt-McCall (“McCall”) to conduct an appraisal of all of its land in Hooksett. The McCall appraisal set a value of $4,000 per acre for land zoned residential and $10,000 per acre for land zoned for industrial use. The appraisal did not focus specific attention on the 42-Acre Parcel.
In May 1990, Hooksett adopted a local zoning ordinance entitled Mixed Use District 5 — MUD 5 (“the MUD-5 Ordinance”). The MUD-5 Ordinance limited the development of Manchester’s roughly 3,000 acres to “net usable acreage,” which excludes wetlands, property burdened by easements, and rights-of way. The MUD-5 Ordinance also imposed various zoning restrictions on the property, restricting use in some areas to industrial, commercial, or residential, designating certain land for public use and conservation areas, and setting open space requirements. The MUD-5 Ordinance specifically limited the development of Manchester Sand’s West Side Property by imposing a 25 percent cap on the net usable acreage that could be zoned for commercial use, designating the rest for industrial use.
In or about 1991, after consulting with David Campbell (“Campbell”), a real estate broker and attorney who specialized in local planning matters in New Hampshire, Manchester Sand designated the 42-Acre Parcel for commercial use under the MUD-5 Ordinance, and that designation was approved in 1991 and again in 1995 by the Hooksett Planning Board.[2] Once the excluded uses defined in the MUD-5 Ordinance were subtracted from the gross total acreage of the West Side Property, the 42-Acre Parcel was approximately 25 percent of its “net usable acreage.”
In 1995, Dean, Jr. was the President and Chief Executive Officer of Boston Sand, as well as a director of both Boston Sand and Manchester Sand. Jeanne-Marie was Vice-President, Treasurer, and Secretary of Boston Sand, and also a director of both Boston Sand *293 and Manchester Sand. That year, when it was apparent that the 42-Acre Parcel would be mined out and therefore would no longer produce any income for Manchester Sand, Dean, Jr. and Jeanne-Marie spoke with Campbell regarding the possible sale of the 42-Acre Parcel. Campbell told them that the local market for commercial property remained weak at that time because of the real estate collapse of the late 1980s and early 1990s. He added that there were a number of unsold commercially designated parcels located nearby, including some owned by the Federal Deposit Insurance Corporation, that had direct frontage on Route 3 and would be more attractive to a commercial purchaser. The 42-Acre Parcel was located almost a half mile off of Route 3, behind an existing commercial use — -the Granite State Marketplace.
Campbell later told Dean, Jr. and Jeanne-Marie that he had had discussions with potential buyers of the 42-Acre Parcel, including the owners of the Granite State Marketplace and a theater chain, but there was no interest in the property. He said that he did not think there was a ready market for sale of the property to a third-party buyer at that time.
Dean, Jr. and Jeanne-Marie told Campbell that they would be willing to purchase the 42-Acre Parcel.[3] They asked Campbell to obtain an independent, third-party valuation of the Parcel to determine a potential purchase price. Campbell chose to retain Applied Economic Research, Inc. (“AER”), a licensed New Hampshire appraisal company, to perform the valuation. On October 25, 1995, AER sent Campbell its written appraisal, entitled “Preliminary Limited Summary Appraisal Report” (“the AER Appraisal”), which estimated that the fair market value of the 42-Acre Parcel as of July 26, 1995 was between $240,000 and $270,000, or roughly $7,000 to $8,000 for each of the roughly 34 usable acres.[4] The AER Appraisal made clear that it was a “limited appraisal,” not “a complete appraisal report,” both of which are terms of art under the Uniform Standards of Professional Appraisal Practice. The AER Appraisal specifically declared, “It should be clearly understood that this Limited Summary Appraisal Report carries with it a lower degree of reliability than a complete appraisal that does not invoke the Departure Provision, and consequently the value estimate is presented in a value range rather than a single number.” AER Appraisal at 1. The AER Appraisal noted that the appraiser had relied on second-hand sources of information, such as other appraisers and town records, and had not physically inspected the comparables used in the analysis nor confirmed the comparable sales with the buyer or seller. Id. The Appraisal, however, also declared, “It is the appraiser’s determination that this appraisal was not so limited as to result in a misleading or confusing report.” Id. Campbell, after reviewing the AER Appraisal, told Dean, Jr. and Jeanne-Marie that the valuation conclusions appeared reasonable.
On February 27, 1996, at a Board of Directors meeting of Boston Sand, Dean, Jr. and Jeanne-Marie provided the Board with a memorandum from Jeanne-Marie proposing that Dean, Jr. and Jeanne-Marie (or their nominee) be authorized to lease the 42-Acre Parcel from Manchester Sand, effective June 30, 1996, at $2,000 per month, with a three-year option to purchase the Parcel for $255,000.[5] The memorandum declared that Dean, Jr. and Jeanne-Marie intended to operate a driving range and recreation facility on the land. Dean, Jr. and Jeanne-Marie also provided the Board with a copy of the AER Appraisal. They asked the Board to consider their request to lease the 42-Acre Parcel, with an option to buy, at the next regularly scheduled Board meeting.
At the next regularly scheduled Board meeting on May 21, 1996, the Board voted unanimously to approve the transaction set forth in the February 27, 1996 memorandum. Voting at the meeting were the following Boston Sand directors:
Dean Boylan family members Dean, Sr., Dean, Jr., and Jeanne-Marie;
Silverstein, Boston Sand’s corporate counsel;
Dominic DiMaggio, the former great center fielder of the Boston Red Sox[6] and, later, a businessman, who is also a lifelong friend of Dean, Sr.;
John Graham, an industiy consultant and lifelong friend of Dean, Sr.; and
John Hallisey, a former Boston Sand executive who was elected Chairman of the Board at that meeting and continued as a director until his death in 1999.
Days before the May 21, 1996 Board meeting, Dan’s attorney, Paul Ryan (“Ryan”), spoke with Silverstein and learned that Manchester was going to lease the 42-Acre Parcel to Dean, Jr. and Jeanne-Marie. This was the first time anyone associated with Dan had learned of this proposed transaction. On June 6, 1996, after the Board vote, Ryan received from Silverstein for the first time the written terms of the lease transaction and a copy of the AER Appraisal. Ryan complained that he and Dan had not been informed of this transaction, and Silverstein responded that Dean, Jr. and Jeanne-Marie did not have to inform them, because Manchester is a subsidiary of Boston Sand. Ryan did not accept this interpretation of the Separation Agreement.
On June 19, 1996, Ryan, on behalf of Dan, wrote Dean, Jr. and stated Dan’s objection to the proposed lease. He asked the Boston Sand Board again to review this transaction. He attached a letter he had written that day to Silverstein stating that he had retained a real estate consultant whose preliminary view was that the purchase price of $7,500 per usable acre was low. Ryan wrote that he and Dan had authorized a full appraisal of this property and would make a copy of the appraisal available to the Board once it was completed. He asked that no steps be taken to implement this agreement until the Board could consider the new appraisal. Despite this request, on June 30, 1996, *294 Dean, Jr., on behalf of Manchester, and Jeanne-Marie, on behalf of Ankat, signed a Ground Lease for the 42-Acre Parcel with the terms set forth in the February 27, 1996 memorandum.
On September 23, 1996, Ryan provided Boston Sand with a copy of the appraisal prepared by David Kirk, the appraiser retained by Dan (“the Kirk Appraisal”). The Kirk Appraisal opined that the fair market value of the 42-Acre Parcel as of July 1, 1996 was $600,000. One of the “special assumptions” in the Kirk Appraisal is that “approximately 40 acres of the subject parcel are developable, although no certification is made.” Kirk Appraisal at 4.
On November 4, 1996, attorney Moxham, on behalf of Dan, wrote a letter to Dean, Jr. asking the Boston Sand Board to rescind the Ground Lease and prevent the sale of the 42-Acre Parcel in view of the Kirk Appraisal, which he attached, stating that the purchase price under the option in the Ground Lease was “grossly unfair, . . . especially when one considers that the $255,000 purchase price will be paid five years in the future, compared to an appraisal value of $600,000 in July 1996.” Moxham alternatively requested, “At a minimum, those Directors of [Boston Sand] who have no financial or family interest in the transaction should engage a totally independent appraiser to opine on both the value of the [42-Acre Parcel] and the benefit or detriment to [Manchester] and [Boston Sand] from separating the [42-Acre Parcel] from the larger 250 acre commercially zoned parcel.” On November 6, 1996, Ryan, also on behalf of Dan, wrote Silverstein asking him to deliver to each of the Board members of Boston Sand and Manchester a copy of Moxham’s submission at least one week before the next Boston Sand Board meeting if Dean, Jr. and Jeanne-Marie intended to continue with the transaction.
All the Boston Sand directors were provided with a copy of Moxham’s submission on November 11, 1996, eight days before the next regularly scheduled Board meeting on November 19, 1996. At that Board meeting, the Board discussed Dan’s objections to the Ground Lease but did not vote either to rescind the transaction or to ratify it.
The plaintiffs filed the instant action in 2002. On March 15, 2006, each director was provided with Jeanne-Marie’s February 27, 1996 memorandum (including the AER Appraisal), the Moxham submission (Including the Kirk Appraisal), the minutes prepared by Jeanne-Marie of the relevant prior Board meetings,[7] and the plaintiffs’ verified complaint. The Boston Sand Board meeting took place at 10 a.m. on March 16, 2006. At that meeting, the directors unanimously voted to ratify the Board’s decision on May 21, 1996 approving the lease of the 42-Acre Parcel to Ankat under the terms proposed in Jeanne-Marie’s February 27, 1996 memorandum. Apart from Hallisey, who had died in 1999, the directors who voted at that meeting were the same who had originally voted to approve the transaction on May 21, 1996, with the addition of one director — John Mahoney, who had joined the Board in 1996.
The plaintiffs have also submitted a report from Richard A. Bonz (the “Bonz Report”), which states, as a hypothetical, that if Hooksett constructed a “Parkway Corridor” near the 42-Acre Parcel, the future value would increase. If built, the 42-Acre Parcel’s present value would be $1,070,000 according to the Bonz Report. Notably, the Kirk Appraisal characterized the development of the Parkway Corridor as “speculative in nature.”
The Provision of Trucking Services By Collden
Having alleged that Boston Sand increased the price levels and/or the volume of the trucking services that Collden provided to Boston Sand more than ten percent beyond the Baseline Level set in the Separation Agreement without prior notice to Dan or the approval of the Boston Sand Board, the plaintiffs were asked in Interrogatory No. 5 to state the amount of damages claimed and the factual basis for such an assertion of damages. In the initial answer to this interrogatory, no information was provided as to the Collden breach of contract claim. The defendants moved to compel an answer as to the damages asserted for this claim, and the motion was allowed by this Court on September 14, 2005, with the supplementary answer due fourteen days later. The Estate timely filed a supplemental answer but it simply asserted that it could not determine the profits derived by Collden from the prohibited transactions or the amount of damages “without further factual disclosure and expert analysis.” To date, this supplemental answer has yet to be supplemented with a meaningful estimate of damages arising from the Collden claim.
DISCUSSION
Claims Arising From the Lease of the 42-Acre Parcel
Dean, Jr. and Jeanne-Marie, as directors of Boston Sand, owed a fiduciary duty to the corporation, which included both a duty of care and a duty of loyalty. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 528 (1997). Since they were both directors and shareholders of Boston Sand, and since Boston Sand was a closely-held corporation, they owed their fellow shareholders, including Dan, “substantially the same duty of utmost good faith and loyalty in the operation of the enterprise that partners owe to one another, a duty that is even stricter than that required of directors and shareholders in corporations generally.” Id. at 529; Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 592-594 (1975).
If Dean, Jr. and Jeanne-Marie wished Boston Sand to engage in a self-dealing transaction, such as the lease or sale of the 42-Acre Parcel to Ankat, a corporation owned by them, they must:
1. make full and honest disclosure of all the known material facts of the proposed transaction, including the details of the transaction and their conflict of *295 interest; Demoulas at 531. See Puritan Medical Ctr. Inc. v. Cashman, 413 Mass. 167, 172 (1992); Dynan v. Fritz, 400 Mass. 230, 243 (1987) (“good faith requires a full and honest disclosure of all relevant circumstances to permit a disinterested decision maker to exercise its informed judgment”); ALI Principles of Corporate Governance §5.02(a) (1994); and
2. “then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation.” Demoulas at 533. The burden of proving that the assenting directors were disinterested rests with the self-dealing directors, see Houle v. Low, 407 Mass. 810, 824 (1990), as does the burden of proving that the self-dealing was “intrinsically fair, and did not result in harm to the corporation or partnership” if the transaction was approved by self-interested directors. Demoulas at 530-31, quoting Meehan v. Shaughnessy, 404 Mass. 419, 441 (1989).
If the self-dealing directors fail to provide full disclosure of the material facts of their proposed transaction, then they breach their fiduciary duty by proceeding with the transaction, regardless of its approval by the Board or its fairness to the corporation. See Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. 120, 128 (1997) (“full disclosure of all material facts respecting the finder’s fee agreement [is] a prerequisite for enforcement”). The Board’s approval is vitiated by the failure of full disclosure.
If the self-dealing directors provide full disclosure to the Board and the transaction is approved by the disinterested directors, then the decision enjoys the deference provided by the business judgment rule. See Harhen v. Brown, 431 Mass. 838, 847 (2000). If the self-dealing directors provide full disclosure to the Board and the transaction is approved by self-interested directors, the decision does not enjoy the benefit of the business judgment rule and must be demonstrated to be fair to the corporation. Demoulas at 533.
In scrutinizing the May 21, 1996 approval of the terms of the lease of the 42-Acre Parcel to Ankat, this Court first must consider whether Dean, Jr. and Jeanne-Marie’s disclosure to the Board constituted full and honest disclosure of all the known material facts of the proposed transaction. This Court does not accept the Estate’s argument that the disclosure was inadequate because the AER Appraisal was only a limited appraisal. The AER Appraisal clearly so declared, and set forth the lower degree of reliability that arose from being only a limited appraisal. This Court, however, does find that Dean, Jr.’s and Jeanne-Marie’s disclosure was less than full and honest as to one significant material fact — they did not inform the Board that they had failed to provide written notice to Dan of the proposed Ankat lease transaction at least thirty days before the Board meeting at which approval was to be sought, in violation of Section 6(b) of the Separation Agreement entered into between Dan and Boston Sand, which required such notice whenever Boston Sand was contemplating entering into any new related party transaction with Dean, Jr. or Jeanne-Marie.[8]
Under the Separation Agreement, Dan, once he received thirty days notice of the proposed transaction, was entitled to submit to Boston Sand’s Board his position on the proposed transaction. Separation Agreement at §6(b). If he did not provide Boston Sand with “written notice of objection to any such proposed transaction within thirty (30) days of his receipt of the notice and information described above, he . . . shall be deemed to have approved of such transaction and shall have waived all rights to object thereto ...” Id. By failing to notify the Board of the failure to provide this required notice to Dan, the Board was denied material information that they should have considered before approving the lease of the 42-Acre Parcel to Ankat. Specifically, without this information, the Board did not know that Dan had not approved the proposed transaction by failing to submit a written objection, and also did not know that Boston Sand had breached its contractual obligation to Dan by failing to provide the required notice, thereby exposing Boston Sand to the risk of liability. By failing to provide this material information, Dean, Jr. and Jeanne-Marie failed to fulfil the essential element of full and fair disclosure of the proposed self-dealing transaction by denying the Board material information that it should have had the opportunity to consider before approving the lease of the 42-Acre Parcel to a corporation owned by Dean, Jr. and Jeanne-Marie. Therefore, this Court finds that Dean, Jr. and Jeanne-Marie breached their fiduciary duty in seeking the Board’s approval of the Ankat lease on May 21, 1996 without informing the Board of their failure to provide Dan with the required thirty-day notice of the proposed transaction.[9]
Boston Sand contends that it had no obligation to give Dan notice of the proposed lease of the 42-Acre Parcel because the Parcel was owned by Manchester Sand and the Separation Agreement was executed by Boston Sand, and did not specifically define Boston Sand to include its wholly-owned subsidiaries. There are two fatal flaws with this argument. First, even if the Agreement bound only Boston Sand, not Manchester Sand, the proposed lease transaction was authorized by the Board of Directors of Boston Sand, not Manchester Sand, so Boston Sand plainly recognized that it had the authority to approve the transaction. Second, the release provision in the Separation Agreement released not only Boston Sand from liability , for all prior claims (except those arising from the Settlement Agreement and the Separation Agreement) but also all entities controlled by Boston Sand, including Manchester Sand. In view of the language of the release, it is reasonable to infer that the related party transactions addressed in the Agreement included those between the Dean Boylan family and both Boston Sand and its wholly-owned subsidiaries.
*296 The breach of fiduciary duty arising from the failure to provide the Board with full and fair disclosure of the absence of the required thirty-day notice to Dan renders ineffective the Board’s approval of the proposed transaction on May 21, 1996, but it does not end the inquiry, because the Board considered the transaction again on November 19, 1996. Prior to this Board meeting, all the Boston Sand directors knew that Dan had learned of the lease transaction and had vigorously opposed it, and had received a copy of the Moxham submission, which included not only Dan’s reasons for opposing the lease transaction but also the Kirk Appraisal, with its substantially higher fair market value for the 42-Acre Parcel. If the Board had formally ratified the Ground Lease, its ratification pragmatically may have cured the defective disclosure that nullified its original approval six months earlier. There is no dispute, however, that the Board did not vote at this meeting either to ratify or rescind the Ground Lease. Nor can this Court infer such ratification by the mere fact that the Board discussed the transaction and did not vote to rescind it. Indeed, even Jeanne-Marie’s belatedly prepared minutes of the November 19, 1996, whose accuracy the Estate vigorously contests, do not support the inference that the Board ratified the May 21, 1996 approval. Rather, the minutes reflect that Dean, Jr., Jeanne-Marie, Silverst-ein, DiMaggio, and Mahoney all agreed that a third appraisal should be conducted to establish the option price for the 42-Acre Parcel. Dan’s attorney, Ryan, however, did not agree to be bound by the fair market value established in a third appraisal, and DiMaggio and Mahoney both declared that an agreement should be in place as to the practical consequence of a third appraisal before a third appraiser was engaged. As a result of this stand-off, nothing happened; no new appraiser was retained by Boston Sand and the earlier Board approval was neither ratified nor rescinded.
On March 16, 2006, four years into the litigation, the Board belatedly did unanimously ratify the Board’s decision on May 21, 1996 approving the lease of the 42-Acre Parcel to Ankat under the terms proposed in Jeanne-Marie’s February 27,1996 memorandum. As noted earlier, the day before that Board meeting, each director was provided with Jeanne-Marie’s February 27, 1996 memorandum (including the AER Appraisal), the Moxham submission (including the Kirk Appraisal), the minutes prepared by Jeanne-Marie of the relevant prior Board meetings, and the plaintiffs’ verified complaint. As to this meeting, there is no reasonable dispute that formal ratification occurred and that the Board knew not only the details of the transaction and the conflict of interest but also the basis for Dan’s strong opposition to the transaction. Therefore, to determine whether this ratification may legally bind the corporation to the Ground Lease, this Court must determine whether the ratification received the approval of disinterested directors.
Massachusetts courts have adopted the American Legal Institute’s Principles of Corporate Governance regarding the definition of an “interested” director. Harhen v. Brown, 431 Mass. at 842; Demoulas, 424 Mass. at 523-24. Section 1.23(a) of ALI’s Principles of Corporate Governance states that a director is “interested” if that director: (1) is a “party to the transaction”; (2) “has a business, financial, or familial relationship with a party to the transaction or conduct, and that relationship would reasonably be expected to affect the director’s ... judgment with respect to the transaction or conduct in a manner adverse to the corporation”; (3) has associates who have a pecuniary interest in the transaction that “would reasonably be expected to affect the director’s ... judgment”; or, (4) is “subject to a controlling influence” that could reasonably affect the director’s judgment with respect to the transaction in a manner adverse to the corporation. See ALI Principles of Corporate Governance: Analysis and Recommendations §§1.15 and 1.23 (2006) (“ALI Principles”).
At the March 16, 2006 Board meeting, seven directors voted unanimously to ratify the May 21, 1996 Board decision: Dean, Sr., Dean, Jr., Jeanne-Marie, Silverstein, Graham, DiMaggio, and Mahoney. Dean, Sr., Dean, Jr., and Jeanne-Marie were plainly interested parties, and were recognized as such at the Board meeting. According to the Board minutes, there was a discussion prior to the vote as to whether they should abstain and it was determined that it did not matter whether they voted because the other four directors were going to vote unanimously to ratify.
Silverstein at the time of the vote was a partner in the law firm of Bingham McCutchen, LLP. He had performed legal work for Boston Sand and the other Boylan family companies since 1975, except for two years (1984-1986) when he left the law firm to become president of a real estate company. Apart from these two years, he was the principal corporate counsel for Boston Sand and its related companies since the late 1970s or early 1980s . . . Apart from his corporate work for these entities, he and his law firm had also done estate planning for the Dean Boylan family. This Court finds as a matter of law that the legal work that Silverstein performed for Boston Sand and its related companies, all of them controlled by Dean Boylan’s family, and the estate planning he performed for the Dean Boylan family constituted a business and financial relationship with the Dean Boylan family that “would reasonably be expected to affect” his judgment as a director in determining whether to ratify a self-dealing transaction proposed by Dean, Jr. and Jeanne-Marie. In short, without in any way challenging Silverstein’s integrity as corporate counsel, it would be reasonable to expect that Silverstein’s judgment as to ratification would be affected by the prospect that, if he were to refuse to ratify the transaction, the Boylan family may be angry enough with him to transfer its legal business to another firm or another attorney within his firm, especially since he had ad *297 vised the Boylan family as to the transaction back in 1996. The potential risk of financial loss to his law firm, of which he was a partner, or the potential reduction in his share of the profits of the law firm if he were to lose the Boylan family and its entities as clients, is sufficient to find that he was an interested director as to this ratification decision.
Graham, DiMaggio, and Mahoney, in contrast with Silverstein, had no business or financial relationship with the Dean Boylan family in 2006, apart from their service as directors. Graham joined the Boston Sand Board after retiring from a career in the cement business. He met Dean, Sr. in 1956 when Boston Sand was a customer of the cement company for which he served as sales director, and became his friend, seeing him for dinner roughly four times a year and golf three or four times per year. Each stayed as a guest in each other’s homes over the years.
DiMaggio became close friends with Dean, Sr. about fifty years ago, meeting through their respective wives, and has remained close over the years. He knew Dean, Jr. and Jeanne-Marie through his relationship with their father, but did not socialize with them independently.
Mahoney, before joining the Boston Sand Board, had been a partner at Ernst & Young, Boston Sand’s outside auditor, since 1986, and had been assigned to handle Boston Sand’s account since at or about that time. He left Ernst & Young in 1996, and joined Staples later that year. As of the date of the ratification vote, he served as Staples’ Chief Administrative Officer. He was also a close friend of the Dean Boylan family, having vacationed with them and entertained them in his home. Consequently, while Mahoney once had a business relationship with entities controlled by the Dean Boylan family until 1996, by the time of the ratification vote he had no business dealings with them, just a close personal friendship with the Dean Boylan family.
The Estate contends that the close personal friendships that Graham, DiMaggio, and Mahoney maintained with the Dean Boylan family meant that they were “subject to a controlling influence” that could reasonably affect their judgment as directors and, as a result, should be found to be interested directors. The Comment, however, to Section 1.23 of the ALI Principles specifically declares, “It is not intended that a person would be treated as subject to a controlling influence, and therefore interested, solely because of a long-time friendship or other social relationship, or solely because of a long-time business association through service on the same board of directors or other relationship not involving direct pecuniaiy dealing.” While there is no controlling Massachusetts authority adopting this particular comment, this Court anticipates that the Supreme Judicial Court would adopt, not merely the definition of an interested director in the ALI Principles, but this comment as to whether friendship alone is sufficient to show that a director is “subject to a controlling influence.” See also Beam v. Stewart, 845 A.2d 1040, 1050 (Del. 2004) (“allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director’s independence”).
Nor does the fact that Graham and DiMaggio originally voted in favor of approving the lease in May 1996 cause them to be viewed as interested directors in a vote to ratify that decision, especially when they are not defendants in the instant shareholder derivative action. See ALI Principles, § 1.23(c).[10] Nor does the director’s receipt of usual and customary director’s fees from the corporation cause the director to become an interested director. See, Comment, ALI Principles, §1.23(c). Therefore, this Court finds as a matter of law that Graham, DiMaggio, and Mahoney were not interested directors at the time of the ratification vote.
The fact that all three disinterested directors voted to ratify the May 21, 1996 Board decision does not mean, however, that their ratification vote must be examined under the relatively deferential business judgment rule. Under Mass.R.Civ.P. 23.1, before instituting a shareholder derivative action, the aggrieved shareholder must attempt to obtain the relief he seeks from the court from the directors of the corporation. “The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or majority of shareholders should set the corporation’s business policy, including the decision whether to pursue a lawsuit... However, if a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a ‘demand excused’ case.” Harhen v. Brown, 431 Mass. at 844. The instant case is a “demand excused” case, since Judge Nonnie Bumes found that the Estate properly alleged that a majority of the Boston Sand directors were interested directors and therefore excused the demand. Memorandum of Decision on Defendants’ Motion to Dismiss in the Derivative Action, February 26, 2004, at 8-10.
In a “demand excused” case, the Board, as it did in Houle v. Low, may still act after the suit is filed to determine the propriety of pursuing the shareholder derivative action by a vote of a Special Litigation Committee, appointed by the majority of the directors. As the Supreme Judicial Court in Houle noted, “The fact that the procedural requirement of demand is excused in a given case (as it was here) does not extinguish the substantive principle that the decision as to what is in the corporation’s best interest is a matter of business judgment. An independent and unbiased committee can weigh and balance the divers factors in a given case and make a business judgment as to the proper course of action.” Houle, 407 Mass. at 821. If the Special Litigation Committee voted to continue the derivative action, then the corporation would take over the prosecution of the suit; if it voted not to continue it, then the defendant corporation could move for the dismissal of *298 the suit and the court would need to consider whether to adopt the decision of the Special Litigation Committee.
While the March 16, 2006 Board vote was characterized by Boston Sand as a ratification vote by the Board rather than a vote to determine whether to prosecute the shareholder derivative action, it was functionally the same. If the Board had refused to ratify the 1996 Board decision, Boston Sand would have provided the Estate with some form of the relief it seeks through this litigation. Since the Board ratified the decision, it argues that the ratification requires dismissal of the action. While the entire Board voted to ratify, as opposed to delegating the decision to a Special Litigation Committee of disinterested directors, this, too, is a distinction without a functional difference because the Board recognized that, regardless of the vote of the interested directors, the disinterested directors were all voting in favor of ratification. For all practical purposes, the Board effectively granted the authority to ratify to the disinterested directors, albeit without formally declaring them a Special Litigation Committee.[11] Therefore, in deciding the standard of judicial review of this Board vote of ratification, this Court adopts the standard of review found appropriate by the Supreme Judicial Court in HouLe, when it considered whether to adopt the finding by a Special Litigation Committee that the corporation should not prosecute the shareholder derivative action and should seek its dismissal. See Houle, 407 Mass. at 813-14.
In Houle, the Supreme Judicial Court declared:
The value of a special litigation committee is coextensive with the extent to which that committee truly exercises business judgment. In order to ensure that special litigation committees do act for the corporation’s best interest, a good deal of judicial oversight is necessary in each case. At the same time, however, courts must be careful not to usurp the committee’s valuable role in exercising business judgment. At a minimum, a special litigation committee must be independent, unbiased, and act in good faith. Moreover, such a committee must conduct a thorough and careful analysis regarding the plaintiffs derivative suit. . . The burden of proving that these procedural requirements have been met must rest, in all fairness, on the party capable of making that proof — the corporation.
Id. at 822, citing Auerbach v. Bennett, 47 N.Y.2d 619, 634-36, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979); Zapata Corp. v. Maldonado, 430 A.2d 779, 788-89 (Del. 1981). The Houle Court later declared:
Suppose, however, that the corporate defendant satisfies the judge that the committee was independent. Such an eventuality would raise a second question, the one on which the Zapata and Auerbach courts parted ways. As noted, Massachusetts has always recognized the need for courts to abstain from interfering in business judgments. S. Solomont & Sons Trust v.[ New England Theatres Operating Corp., 326 Mass. 99 (1950)]. At the same time, this court has always “vigorously scrutinize^] the situation” where a director’s loyalty to the corporation is in conflict with his or her own self-interest. American Discount Corp. v. Kaitz, 348 Mass. 706, 711 (1965). Both concerns are present in this case, as is the danger of “structural bias” recognized by so many courts and commentators. The balancing of these various concerns requires reviewing judges to go beyond establishing the committee’s independence, good faith and the adequacy of its investigation.
The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision. Even in those cases where a committee is independent and conducts a thorough investigation, the judge may conclude that the committee’s decision is contrary to the great weight of evidence. In conducting its review, the court should look to factors such as those identified by ALI, which include the likelihood of a judgment in the plaintiffs favor, the expected recovery as compared to out-of-pocket costs, whether the corporation itself took corrective action, whether the balance of corporate interests warrants dismissal, and whether dismissal would allow any defendant who has control of the corporation to retain a significant improper benefit. See ALI Principles of Corporate Governance §7.08 (Tent. Draft No. 8, 1988).
This inquiry will allow the special litigation committee to point out to the judge on what factors it relied and why those factors support its decision. The test will also allow the derivative plaintiff to point out factors not considered by the committee or why those relied upon by the committee do not support its conclusion. Such a limited review by the judge will avoid the problem in the second level of the Zapata test, which requires the judge to exercise his or her own business judgment. The courts are better able to determine the merits of a law suit than whether a decision is correct based on a subjective evaluation of the business policies involved.
Id. at 824-25.
Essentially, the Supreme Judicial Court in Houle established a three-tiered test to evaluate these corporate decisions:
1. whether the directors who made the decision were “independent, unbiased, and [acted] in good faith,” and, if so,
2. whether the independent directors conducted “a thorough and careful analysis” and, if so,
3. whether the decision was “contrary to the great weight of the evidence.”,
This is plainly a “heightened standard of review,” see Harhen v. Brown, 431 Mass. at 846, far more demanding than the usual business judgment test, motivated by the Court’s concern for what it characterized as the “structural bias” of even disinterested directors to *299 endorse the prior decisions of a Board comprised of a majority of interested directors and protect their fellow directors from the risk of liability.[12]
The summary judgment record does not permit this Court to find, as a matter of law, whether Boston Sand met its burden of proving any of these three-tier tests. While this Court has found that Graham, DiMaggio, and Mahoney were not interested directors solely because of their long friendship with Dean, Sr., the first-tier test requires the Court to determine whether they were “independent, unbiased, and [acted] in good faith,” not simply whether they were disinterested. The Supreme Judicial Court in Houle implicitly recognized that the director who alone comprised the Special Litigation Committee was disinterested, because otherwise it would have disregarded her finding as to the propriety of the derivative action. See id. at 820 n.6 (disregarding the interested Board’s subsequent adoption of her finding). It also explicitly found that she acted in good faith. See id. at 823. Yet, the Court still found a material dispute of fact as to whether she was “independent and unbiased,” noting that the pressures on her to recommend dismissal of the action “may have been strong,” especially since her professional advancement as a physician depended on the directors who were defendants in the shareholder derivative action. Id. at 823. While that pressure is absent here, the Court more broadly observed that “typically there are relationships among directors that call for scrutiny of the independence of members of a litigation committee.” Id.
There is also a genuine dispute of fact as to the second and third tiers of the test — whether the disinterested directors conducted “a thorough and careful analysis” and, if so, whether their decision was “contrary to the great weight of the evidence.” To be sure, the summary judgment record raises a significant question as to whether “a thorough and careful analysis” was conducted. Not only did the directors only receive the written materials that they were thoroughly and carefully to analyze one day before the Board hearing, but there is no written statement, either reflected in the Board minutes or in a separate document, describing the care and analysis given to this decision, or the reasons for it.[13]
For these reasons, the defendants’ motion for summary judgment must be denied as to the breach of fiduciary duty claim in Count I and the contract claim in Count II challenging the propriety of the lease of the 42-Acre Parcel. There must be an evidentiary hearing conducted by the Court to determine whether the ratification of the lease in 2006 by the disinterested directors of the Board satisfied the three-tier test established in Houle.
The Breach of Contract Claim Arising From the Provision of Trucking Services By Collden
There is sufficient evidence in the summaryjudgment record to support the Estate’s claim that Boston Sand breached the Separation Agreement by increasing the volume or quantity of trucking services by Collden more than ten percent beyond the Baseline Level established in the Agreement without prior notice to Dan and the approval of the Board. The Estate, however, despite the Order of this Court, has failed to provide in answer to Interrogatory 5 any meaningful estimate of the amount of damages it contends were caused by this breach, even though discovery is now closed. While the Estate blames the defendants for failing to provide the necessary discovery, the Estate did not file any motion to compel the production of documents or interrogatory answers as to this issue. It would be fundamentally unfair to deny Boston Sand any reasonable estimate of damages in answer to its interrogatory, especially in view of the Order of this Court, and still permit the Estate to prosecute this damage claim at trial. Consequently, this Court finds that by failing to provide the required discovery as to the amount of damages it asserts arose from the Collden breach and its factual basis for seeking such damages, the Estate has waived its right to seek such damages at trial. While this Court denies the defendants’ motion for summary judgment as to this claim, it will limit the Estate to future injunctive relief if it prevails at trial.
ORDER
For the reasons stated above, this Court ORDERS as follows:
1. The defendants’ motion for summary judgment is DENIED as to the breach of fiduciary duty claim in Count I and the contract claim in Count II challenging the propriety of the lease of the 42-Acre Parcel. There must be an evidentiary hearing conducted by the Court to determine whether the ratification of the lease in 2006 by the disinterested directors satisfied the three-tier test established in Houle.
2. The defendants’ motion for summary judgment as to the breach of contract claim arising from the provision of trucking services by Collden is DENIED, but this Court will limit the Estate to future injunctive relief if it prevails at trial.
3. Counsel shall confer with each other and the session clerk promptly to schedule a litigation control conference to determine how this case should best proceed in light of this decision.

Boston Sand was also required to give Dan notice that this same information had been furnished to Boston Sand’s auditors.

Campbell had been advising Boston Sand and Manchester Sand about the marketing and disposition of its various New Hampshire properties since the 1980s. He also had represented Dean, Jr. and Jeanne-Marie in various real estate matters, serving both as a real estate advisor and attorney.

The Estate contends that Dean, Jr. and Jeanne-Marie had planned to purchase the Parcel as early as 1992, but this disputed fact is of no consequence in the Court’s determination.

The AER Appraisal noted that 6 to 7 acres of the 42-Acre Parcel were wetlands, and that there was a rough gravel road *300 into the property that would need to be brought up to town specifications if the property were to be developed.

The memorandum proposed that 50 percent of the lease payments be credited toward the purchase price if the option were exercised within the three years.

Although not part of the summary judgment record, my father-in-law still believes that Dominic was a better defensive outfielder than his more famous brother, Joe.

Jeanne-Marie took contemporaneous handwritten notes of these meetings but did not type them into formal Board minutes until shortly before this meeting, well after this litigation had commenced. Because they were prepared roughly ten years after these meetings were held, by a defendant in this litigation, long after the litigation had commenced, the plaintiffs contend that they are patently unreliable. This Court has not relied on those minutes in this statement of the facts except as to matters that are not in dispute.

The Separation Agreement barred Boston Sand from entering into any transactions with Dean, Sr. or his children, as long as Dan and his children owned at least five percent of Boston Sand, except those specifically delineated in Section 6(a). Separation Agreement at §6(a). The fourth exception to this bar against self-dealing transactions delineated in Section 6(a) permitted “those other transactions on arms-length terms meeting the notice, information (including notice and information to auditors), and Board of Directors approval requirements set forth in Section 6(b) . . .” Id. Section 6(b) provided that “no later than thirty (30) days before [Boston Sand] obtains Board of Directors approval of any one-time or ongoing transaction” authorized within the fourth exception, Boston Sand was required to provide Dan with written notice of the proposed transaction, “any additional written information provided to [Boston Sand’s] Board of Directors in connection with obtaining Board of Directors approval thereof, and a certificate of the President of [Boston Sand] stating that copies of such notice and information have been sent to [Boston Sand’s] auditors.” Id. at §6(b). By failing to give Dan the advance notice required by this provision, Dean, Jr. and Jeanne-Marie both breached the Separation Agreement and the fiduciary duty they owed to Dan as a minority shareholder.

The record is silent as to whether Dean, Jr. and Jeanne-Marie also failed to provide notice of this proposed transaction to Boston Sand’s auditors, as required under the Separation Agreement.

Section 1.23(c) of the ALI Principles reads in its entirety:
(c) A director is interested in an action within the meaning of Part VII, Chapter 1 (The Derivative Action), but not elsewhere in these Principles, if:
(1) The director is interested, within the meaning of Subsection (a), in the transaction or conduct that is the subject of the action, or (2) The director is a defendant in the action, except that the fact a director is named as a defendant does not make the director interested under this section if the complaint against the director:
(A) is based only on the fact that the director approved of or acquiesced in the transaction or conduct that is the subject of the action, and
(B) does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders
ALI Principles, §1.23, quoted with approval in Harhen v. Brown, 431 Mass. at 842 n.5.

Indeed, in Houle, the entire Board voted to adopt the finding of the Special Litigation Committee, which was comprised of the only disinterested director on the Board, but the Court ignored the directors’ vote, calling it “ineffective.” ‘The only corporate action with legal significance is [the Special Litigation Committee’s] recommendation itself.” Id. at 820 n.6.

The Supreme Judicial Court in Houle declared that the concern regarding the “structural bias” of even disinterested directors was “not unfounded.” Id. at 815. The Court explained:
A number of commentators have recognized the possibility of inherent bias when “independent” directors pass judgment on other directors. In Cox & Munsinger, Bias in the Boardroom: Psychological Foundations and Legal Implications of Corporate Cohesion, 48 Law & Contemp. Probs. 83, 84-85 (No. 3, 1985), the authors “examine[d] several social-psychological mechanisms that can generate bias in the directors’ assessment of the suit, including biases established by appointment of members to the board or a special litigation committee, control of pecuniary or non-pecuniaiy rewards made available to the independent directors by the defendant members of the board of directors, the independent directors’ prior associations with the defendants, and their common cultural and social heritages.” Id. at 84-85. They concluded that, “in combination, these several psychological mechanisms can be expected to generate subtle, but powerful, biases which result in the independent directors’ reaching a decision insulating colleagues on the board from legal sanctions.” Id. at 85. In another article, the following contention appears: “[A] derivative action invokes a response of group loyally, so that even a ‘maverick’ director may feel compelled to close ranks and protect his fellows from the attack of the ‘strike suiter.’ ... [A] refusal to protect one’s peers once events have transpired is seen as disloyal treachery.” Coffee & Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposal for Legislative Reform, 81 Colum.L.Rev. 261, 283 (1981). As the Supreme Court of Delaware has noted, even in the case of an independent director, “[t]he question naturally arises whether a ‘there but for the grace of God go I’ empathy might not play a role.” Zapata Corp. v. Maldonado, 430 A.2d 779, 787 (Del. 1981).
Id. at 815-16.
This Court recognizes that the Supreme Judicial Court in Harhen v. Brown, decided ten years after Houle, held that the business judgment rule applied to the refusal of a pre-suit demand by a Board comprised of a majority of disinterested directors (or a Special Litigation Committee of disinterested directors appointed by that disinterested Board), “absent a showing of bad faith or lack of investigation into the demand.” 431 Mass. at 847. The Harhen Court, however, specifically distinguished its facts from those in Houle, recognizing that it had established a “heightened standard of review” to the Board’s decision in Houle. Id. at 846-47. The Court explained the distinction:
The difference between Houle and the present case turns on whether a majority of the board is “interested.” In a demand refused case such as this, where the majority of the board is disinterested, the long-standing rule in Massachusetts is that the business judgment rule applies, absent a showing of bad faith or lack of investigation into the demand. See Dunphy v. Traveller Newspaper Ass’n, [146 Mass. 495, 497 (1888)] (“Intelligent and honest [people] differ upon questions of business policy. It is not always best to insist upon all one’s rights . . .”). When a disinterested board refers a demand to a disinterested standing committee, both receive the protection of the business judgment rule.
Id. at 847.

In contrast, in Houle, the Special Litigation Committee retained an attorney who prepared a report of the Committee’s findings. Houle, 407 Mass. at 813.